**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 8, 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WESTON CHARLES LAUDER III,

Defendant-Appellant.

No. 04-2120

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CR-02-2262-JP)**

Thomas L. Wright, El Paso, Texas (Manuel Barraza, El Paso, Texas, with him on the briefs), for Defendant-Appellant.

Robert D. Kimball, Assistant United States Attorney, (David C. Iglesias, United States Attorney, and Laura Fashing, Assistant United States Attorney , Albuquerque, New Mexico, on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

Before **O'BRIEN** , **McCONNELL** , and **TYMKOVICH** , Circuit Judges.

**TYMKOVICH** , Circuit Judge.

In May 2004, a jury in the United States District Court for the District of

New Mexico convicted Weston Charles Lauder III on the following four counts

related to the possession and distribution of illegal drugs: Conspiracy under 21 U.S.C. § 846 to violate 21 U.S.C. § 841(a)(1) and (b)(1)(A)–(B) (Count I); maintaining a building for the manufacture and distribution of cocaine base in violation of 21 U.S.C. § 856(a)(1) (Count II); and possession with intent to distribute 50 grams or more of cocaine base (Count III) and 500 grams or more of powder cocaine (Count IV) within 1,000 feet of a school under 21 U.S.C. § 860(a).

On appeal, Lauder alleges that (1) the evidence was insufficient to support the jury's verdict, (2) a new trial is needed due to an alleged violation of Lauder's Fifth Amendment right to remain silent, (3) the district court erred in admitting fingerprint evidence, and (4) the district court erred in the amount of drugs it attributed to Lauder for sentencing purposes, which error violated Lauder's Sixth Amendment rights under *United States v. Booker*, —U.S. —, 125 S. Ct. 738 (2005).

For the reasons set forth below, we AFFIRM the district court's order of conviction and the resulting sentence.

## I.  BACKGROUND

On September 16, 2002, acting pursuant to a search warrant based on information supplied by a confidential informant, a Lea County Drug Task Force conducted a search of a residence in Hobbs, New Mexico.  According to the

warrant, the house belonged to Kena LaShawn Wright, but somebody referred to as "BL" also resided there. Upon arrival, the officers knocked on the door and announced they had a warrant to search the house. Although the officers heard footsteps running through the house, nobody answered the door. The officers then kicked open the door, entered the house, and found Weston Charles Lauder III lying face down and spread-eagle in the kitchen area. Nobody else was in the house.

During the search, the officers found large quantities of cocaine, crack, and money. In the master bedroom, for example, the search revealed approximately 124 grams of powder cocaine and $5,630 in the pocket of a brown sweatshirt that was hanging in the closet. There was also a blue jacket found in the closet that contained approximately 49.2 grams of crack cocaine and negligible amounts of marijuana in its hood. A dresser drawer contained six grams of crack cocaine and $295. The officers also retrieved a duffle bag containing men's clothing and a baggage claim tag in Lauder's name.

The officers searched the backyard and found, buried in the ground, $12,000 in cash and, separately, approximately 745 grams of powder cocaine that was wrapped in two plastic bags. The officers also searched Lauder's person. In Lauder's wallet they found several pieces of paper that contained the initials of numerous people written next to money amounts. According to the testimony of

the arresting officer, the papers were consistent with drug ledgers that are typically kept by people involved in drug distribution. Later witnesses, in fact, matched the initials found in Lauder's wallet to known drug dealers.

Following the search, the Task Force contacted the Drug Enforcement Agency and referred the case to the federal government for prosecution. Lauder was transferred to the DEA's custody in Las Cruces, New Mexico, whereupon a DEA agent recorded Lauder's fingerprints using a digital infrared scanner, referred to as the "live-skin method," which, according to testimony given at trial, operates essentially like a copy machine. Lab analysis by the DEA determined that Lauder's digitally-obtained fingerprint matched a latent fingerprint that was found on one of the plastic bags containing cocaine and buried in the backyard.

At trial, the government introduced two cooperating witnesses that testified about Lauder's drug activities. The first, Soleil Sligh, stated Lauder's nickname was "BL" ("Big Little") or "Little Man," and that she began buying crack from him in approximately February 2002. Sligh testified that on separate occasions she purchased a total of approximately 425 grams of crack cocaine and 255 grams of powder cocaine from Lauder, which she in turn resold to drug users. She also helped Lauder sell an additional 255 grams of crack cocaine, and that on another occasion Lauder transported an additional 255 grams of crack cocaine from California to New Mexico. Sligh then testified that on at least one occasion she

witnessed Lauder "cook" powder cocaine into crack while he was staying at Kena Wright's house and that many of the initials on the papers found in Lauder's wallet corresponded to known drug dealers in Hobbs. Finally, she stated that the brown sweatshirt found in the bedroom belonged to Lauder and that "he keeps his money in [the sweatshirt] and sometimes his dope." Aple. Supp. App. II, at 213.

The second cooperating witness was Idella Royals, Kena Wright's cousin. Royals testified that "once or twice" she sold crack cocaine she had purchased from Lauder. She also described an incident in which Lauder, after returning to New Mexico from California, walked into the kitchen, pulled up his shirt, and unstrapped a long package that was taped to his waist. Royals testified that the package, which was wrapped in plastic, "appear[ed] to be Coke" and "looked like powder." Id. at 265, 268. Furthermore, although she never witnessed Lauder sell drugs to anybody other than herself and Kena Wright, Royals testified that numerous known drug dealers came to the house to see Lauder, and she suspected they were buying cocaine. And, like Sligh, Royals recognized the brown sweatshirt as belonging to Lauder and referred to him as "BL."

Following Lauder's conviction by a jury, the district court adopted the factual findings in the pre-sentence report. In calculating drug amounts, the PSR added together the illegal drugs found during the search of the house with the additional drugs that the cooperating witnesses had purchased from Lauder. The

PSR also noted that the amount of seized cash ($17,630) was consistent with the sale of an additional 176 grams of powder cocaine. The court then applied the Drug Equivalency Tables in USSG § 2D1.1, finding that the total amounts of powder cocaine, crack cocaine, and marijuana involved in the conspiracy was the equivalent of 10,346 kilograms of marijuana. This amount resulted in a base offense level of 38 under the sentencing guidelines. No enhancements were added. With a Category I criminal history, the applicable guideline range was 235–293 months. The district court sentenced Lauder to 240 months imprisonment.

## II. DISCUSSION

Lauder raises four separate issues on appeal. We first address the issues going to the merits of the conviction, and then turn to Lauder's sentence.

### A. Sufficiency of the Evidence

Sufficiency of the evidence to support a jury's verdict is a legal issue we review de novo. *United States v. Norman*, 388 F.3d 1337, 1340 (10th Cir. 2004). We review the evidence in the light most favorable to the government to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Reece*, 86 F.3d 994, 995–96 (10th Cir. 1996) (quotation omitted). Furthermore, we do not "question the jury's credibility determinations or its conclusions about the weight

of the evidence." *United States v. Lazcano-Villalobos*, 175 F.3d 838, 843 (10th Cir. 1999).

We note initially that although Lauder was convicted on four counts, he only challenges the sufficiency of the evidence tying him to the drugs and his intent to distribute them. He does not challenge the existence of a conspiracy under 21 U.S.C. § 846, the maintenance of a building for the manufacture of crack cocaine under 21 U.S.C. § 856(a), or that drug distribution, if established, occurred within 1,000 feet of a school under 21 U.S.C. § 860(a).[1] In reviewing the evidence, therefore, we focus our attention on the sufficiency of the evidence with respect to 21 U.S.C. § 841(a)(1), possession with intent to distribute crack and powder cocaine.

To support a conviction for possession of illegal drugs with intent to distribute under 21 U.S.C. § 841(a)(1), the government is required to prove beyond a reasonable doubt that

(1)   the defendant knowingly possessed the illegal drugs, and

(2)   the defendant possessed the drugs with the specific intent to distribute them.

*Reece*, 86 F.3d at 996. Possession may be either actual or constructive. "[C]onstructive possession exists where the defendant has the power to exercise

---

[1] It is undisputed that Kena Wright's house where Lauder was staying is located approximately 200 feet from a school.

control or dominion over the [contraband]." *United States v. Lopez*, 372 F.3d 1207, 1212 (10th Cir. 2004). Control or dominion over the premises where the contraband is found is a factor, but not a requirement, for finding constructive possession of the contraband itself. *Id.* at 1213. Where, however, the defendant has exclusive possession of the premises, dominion, ownership, and control are properly inferred. *United States v. Mills,* 29 F.3d 545, 549 (10th Cir. 1994). In joint occupancy cases where possession is not clear, such as where the drugs may be attributed to more than one person, we require some nexus, link, or other connection between the defendant and the contraband. *Id.*

As noted, the core of Lauder's argument is that the government failed to prove a nexus between him and the drugs recovered during the raid. He points out, for example, he was "a transient" and "living out of a travel bag" at the time of the raid, thus suggesting he cannot be held responsible for the contents of a house that he did not own. Aplt. Br. at 17. But Lauder ignores substantial evidence linking him to the crime scene, and, in any event, our case law shows that regardless of who owns or rents the house, a conviction for constructive possession is properly sustained where the evidence "support[s] at least a plausible inference that the defendant had knowledge of and access to the . . . contraband." *Norman*, 388 F.3d at 1341 (quotation omitted). This standard is easily met here.

There is abundant evidence that Lauder had knowledge of the illegal drugs. To begin, the brown sweatshirt found hanging in the bedroom closet was connected to Lauder by the testimony of the two cooperating witnesses. Both witnesses testified they had seen Lauder wear the sweatshirt, and one of the witnesses, Soleil Sligh, even stated that Lauder commonly used the sweatshirt to keep money and drugs. The fact that this sweatshirt was found hanging in the same closet as other clothing containing crack cocaine, and in the same room as the dresser drawer containing crack cocaine, is additional evidence supporting an inference that Lauder had knowledge of those drugs as well. Regarding the cocaine buried in the backyard, the presence of Lauder's fingerprint on the plastic bag offered the jury compelling evidence that Lauder had knowledge of the bag's contents. Idella Royals' testimony that she saw Lauder unstrap a long package that "appear[ed] to be Coke" and "looked like powder" further bolstered this evidence. A reasonable jury could conclude the package spoken of by Royals was the same one found buried in the backyard.

As to access, Lauder was the only person in the house when the Task Force conducted its raid. This fact, although certainly not determinative in a joint occupancy case such as this, supports an inference that Lauder had access to the contents of the house and its environs, especially where Wright was not home at the time of the raid. Additionally, Royals, who was also living in the house at the

-9-

time, testified that Lauder and Wright were sharing the master bedroom. This was corroborated by an officer's testimony that men's clothing was strewn throughout the master bedroom and that there was a duffle bag containing a baggage claim tag in Lauder's name. Lauder, in fact, claimed ownership of the bag and its contents. Finally, a confidential informant tipped the Task Force that someone referred to as "BL" occupied the house. Taken together, these facts show that Lauder was living in Kena Wright's house at the time of the raid, thus supporting an inference that he had access to the contents of the house.

Lastly, as required by § 841(a), the evidence was sufficient to show that Lauder possessed the drugs with the specific intent to distribute them. Testimony by Sligh and Royals was particularly relevant in this regard. Sligh testified, for example, that she repeatedly purchased crack and powder cocaine from Lauder which she then resold to drug users. She also stated she witnessed Lauder sell drugs himself. Royals testified she bought crack cocaine from Lauder, and, additionally, that numerous known drug dealers came to the house to see Lauder, presumably to purchase drugs. The Task Force also recovered large sums of cash and drugs, both of which is indicative of drug distribution. *See Jenkins*, 175 F.3d at 1216–17. Of the approximately $17,000 in cash recovered during the raid, most was in $20 bill denominations, the standard street price of one crack rock in Hobbs, New Mexico. Finally, the jury also heard testimony that drug dealers

typically keep a drug ledger such as the one found in Lauder's wallet. To cement the issue, Sligh's testimony linked the initials written on those ledgers to known drug dealers.

In sum, viewed in the light most favorable to the government, a reasonable jury could conclude that the evidence, taken together with the reasonable inferences therefrom, was sufficient to prove that Lauder knowingly possessed with the intent to distribute powder and crack cocaine. We therefore deny Lauder any relief on this ground.

## B. Post-Arrest Silence

Lauder next contends the government violated his Fifth Amendment right to remain silent by introducing evidence of his post-arrest silence. Lauder assigns error to the following statements made by a DEA agent testifying for the government:

> Q: Now, with regard to the Defendant himself, what steps did you take with respect to him on September 17th?
>
> A: I put him in the back seat of [the car]. . . . *And I remember that I asked him his rights, and asked him if he wanted to talk to us on the way back to Las Cruces, and he advised he did not*.

Aple. Supp. App. II, at 312–13 (emphasis added).

Lauder's counsel immediately objected and moved for a mistrial, or in the alternative, a curative instruction. The district court judge, declining to grant a mistrial, issued the following curative instruction:

-11-

Ladies and gentlemen, you should disregard the agent's statement with regard to the Defendant's exercise of his constitutional right to remain silent. As most of you know who have watched TV in the last two decades, the Fifth Amendment of the United States Constitution guarantees the Defendant the right to remain silent and to request an attorney if he is going to be questioned. You should not infer from the Defendant's refusal to talk to the officers anything at all about his guilt or anything with regard to the evidence in this case.

*Id.* at 315–36.

We have previously stated that "[t]he general rule of law is that once a defendant invokes his right to remain silent, it is impermissible for the prosecution to refer to any Fifth Amendment rights which defendant exercised." *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)). Although there are narrow exceptions to the general rule, such as the use of silence for impeachment in certain circumstances, *id.*, those exceptions do not apply here. Here, Lauder decided to invoke his right to remain silent, and the agent impermissibly made reference to that decision. Indeed, on appeal the government concedes that the agent's reference to Lauder's post-arrest silence was improper.

But this does not end our analysis. Constitutional violations such as the one at issue here are subject to the harmless error analysis outlined in *Chapman v. California*, 386 U.S. 18, 24 (1967), under which "the beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of [was harmless]." In *United States v. Massey*, 687 F.2d 1348 (10th

Cir. 1982), we set forth a five-factor test to be used in determining whether comments regarding the defendant's silence are harmless. Namely, we consider (1) the use to which the prosecution puts the silence, (2) who elected to pursue the line of questioning, (3) the quantum of other evidence indicative of guilt, (4) the intensity and frequency of the reference, and (5) the availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions. *Id.* at 1353 (citations and quotations omitted).

The government argues that the agent's reference to Lauder's post-arrest silence was harmless beyond a reasonable doubt, and we agree. The agent's statement was not used by the prosecution as substantive evidence of guilt. Instead, the agent, unprovoked by the prosecution, blurted out the statement in a manner that did not advance the government's case in any particular way. *Burson*, 952 F.2d at 1201 (finding the error harmless in part because reference to pre-arrest silence was "an afterthought" of testifying agent and had "little probative value"); *United States v. Brooks*, 940 F.2d 598, 601 (10th Cir. 1991) (to the same effect). With respect to the intensity and frequency of the improper reference, here we are dealing with one off-the-cuff comment that was not repeated or highlighted at any other point in the trial. This situation, therefore, stands in obvious contrast to those cases where the prosecution makes frequent use of the defendant's post-arrest silence by, for example, lengthy cross-

examination or arguments in closing that the defendant's silence is evidence of his guilt. *Cf. Griffin*, 380 U.S. at 610–11 (error not harmless); *Massey*, 687 F.2d at 1352 (same); *see also Burson*, 952 F.2d at 1201 (error harmless in part because "[t]he prosecution made no reference to [defendant's] silence in closing argument or otherwise"). Additionally, as noted above, there was ample evidence of Lauder's guilt without the agent's comment. And finally, the district court immediately gave a curative instruction. *See Battenfield v. Gibson*, 236 F.3d 1215, 1225 (10th Cir. 2001) (error harmless in part because court gave curative instruction).

Thus, taking the *Massey* factors together, we hold that the error in this case was harmless beyond a reasonable doubt. Lauder is therefore not entitled to a new trial on this ground.

**C. Fingerprint Evidence**

Lauder's third argument is that the district court erred in admitting fingerprint evidence tying Lauder to the cocaine buried in the backyard. Prior to trial, the government filed a motion in limine regarding the admissibility of fingerprint evidence it intended to use at trial. In the motion the government outlined the credentials of its fingerprint expert, Anna Zadow, and asserted her expert testimony was admissible under Federal Rules of Evidence 702 and 703. Lauder did not respond to the motion and the court did not issue a ruling prior to

trial.  At trial, Lauder's counsel stated he had no objections to Zadow's expert qualifications, and the district court made a finding under Rule 702 that Zadow was qualified to render an expert opinion.  Lauder objected, however, when the government sought to introduce evidence that a latent fingerprint found on one of the plastic bags containing cocaine matched Lauder's "known" fingerprint.[2]

As justification for his objection, Lauder cited *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), the seminal Supreme Court case governing the admissibility of expert testimony under the Federal Rules of Evidence.  Specifically, Lauder objected to the admission of fingerprint cards containing Lauder's known prints.  The cards were created by technology referred to at trial as the "live-skin method."[3]  In essence, the live-skin method entails the use of a machine that records fingerprints much as a copy machine duplicates paper copies.  The expert, Ms. Zadow, described it at trial:

---

[2] A "latent" fingerprint is a print left on evidence at a crime scene that cannot be seen by the naked eye and must undergo a process of development in order to be examined.  *See* Fern L. Kletter, *Admissibility and Weight of Fingerprint Evidence Obtained or Visualized by Chemical, Laser, and Digitally Enhanced Imaging Processes*, 110 A.L.R.5th 213, at § 2[a] (2005).  A "known" or "exemplar" print is a reproduction of a known subject, usually taken by law enforcement after the subject is in custody.  The reproduction of a known print can be done in several ways, including the traditional ink method or the digital method at issue in this case.  *Id.*

[3] The parties' briefs and the trial transcript refer to the "live-skin method." We are aware, however, that many law enforcement agencies use "LiveScan," an electronic fingerprinting machine similar to the one used in this case.  For purposes of this discussion, we will adopt the term used by the parties.

[It's a] digitally-captured system. It's what I will term live skin . . . because what it is, it's a plate, it's like a glass plate, and it has technology inside of it that when your finger is placed on a glass without ink, it will capture that friction ridged skin and it will appear to have black ink on it when you look on the computer monitor. . . . [A]fter you rolled your ten fingers, those are then printed out using a printer, a computer printer, and put on an 8 by 8 fingerprint card.

Aple. Supp. App. III, at 382–83.

The government first attempted to have the cards admitted into evidence during the testimony of the DEA agent who took Lauder's fingerprints. The district court did not rule on the cards' admissibility at that time, telling the government that "[y]our expert can determine admission." Aple. Supp. App. II, at 326. Zadow then took the stand and described the processes she followed in matching Lauder's known print to the latent print found on the plastic bag. On voir dire examination, Lauder attempted to show that the live-skin method involved new technology that lacked reliability. Zadow admitted, for example, she was not aware of any testing done by a scientific body. Nor did she know its potential error rate, whether it has been accepted by the scientific community, or whether it had been subjected to peer review. However, Zadow stated the live-skin method has been in use for approximately eight years and is routinely used by the FBI, DEA, United States Marshals Service, and numerous local police departments. Other than cross-examination, Lauder's counsel made no proffer of evidence contesting the expert's methodology or the reliability of the equipment

used to capture the print. Following voir dire, the district court admitted the live-skin fingerprint cards.

The Supreme Court, through a trilogy of cases beginning in 1993, has held that federal district courts must perform a gatekeeper role under Federal Rule of Evidence 702 in ensuring that scientific testimony or evidence is both relevant and reliable.[4] *Daubert*, 509 U.S. at 592–93; *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997). In *Kumho Tire Company, LTD. v. Carmichael*, 526 U.S. 137, 141 (1999), the Court made clear that this gatekeeper role applies not only to scientific knowledge, but to "technical" and "other specialized" knowledge as well. Applying *Daubert* in this circuit, we have held that "[a] natural requirement of the gatekeeper function is the creation of a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law," and in the absence of specific findings in the record, "we must conclude that the court abused its discretion in admitting such testimony." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003) (citations and quotations

---

[4] To assist in the assessment of reliability, the Court listed four nonexclusive factors that the district courts may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted by the scientific community. *Daubert,* 509 U.S. at 593–94.

omitted).

According to Lauder, the district court was required to make factual findings regarding the reliability of the live-skin method, which it did not do. Lauder argues further that the court's failure to make such findings amounts to reversible error under *Daubert*. If, in fact, *Daubert* established the applicable guideposts to this case, then Lauder's argument would have some appeal. *See Dodge*, 328 F.3d at 1229 (reversing and remanding for a new trial because district court failed to perform its gatekeeper role). In our view, however, Lauder's reliance on *Daubert* is misplaced. Properly framed, the admissibility of the fingerprint cards is governed by the evidentiary rules regarding foundation and authentication, not *Daubert*.

The applicability of *Daubert* is a question of law that we review de novo. *Norris v. Baxter Healthcare Corp*., 397 F.3d 878, 883 (10th Cir. 2005). By its terms, the *Daubert* opinion applies only to the qualifications of an expert and the methodology or reasoning used to render an expert opinion. *Daubert*, 509 U.S. at 592–93 (noting that trial judge must undertake "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"). *Daubert* generally does not, however, regulate the underlying

facts or data that an expert relies on when forming her opinion.[5]  *Cf.* Fed. R. Evid.

703 ("The facts or data in the particular case upon which an expert bases an

opinion or inference may be those perceived by or made known to the expert at or

before the hearing.").

In this case, Lauder does not challenge Zadow's qualifications as a

fingerprint identification expert or the methodology she used in matching

Lauder's live-skin print to the latent print found on the plastic bag.  These

matters, of course, if challenged by Lauder, could fall within the *Daubert*

framework.  *See, e.g., United States v. Crisp*, 324 F.3d 261, 266–70 (4th Cir.

2003) (analyzing fingerprint identification methodology under *Daubert's* standard

for reliability and relevance); *United States v. Havvard*, 260 F.3d 597, 601 (7th

Cir. 2001) (same).  Instead, Lauder challenges only the evidence-gathering

---

[5] Federal Rule of Evidence 702, which *Daubert* interprets, is not to the contrary.  Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As noted in the Advisory Committee Notes to the 2000 Amendments, subpart (1)'s reference to "sufficient facts or data" calls for a quantitative rather than qualitative analysis.

equipment used to record his known print, and this critical distinction renders *Daubert* inapplicable. Whether the live-skin method generated an accurate image is an authentication question unaffected by *Daubert*. *See* Kletter, *supra* note 2, at § 2[a].[6] The following thought experiment is illustrative: Suppose an expert relies on photographs taken by a new digital camera in forming her opinion. A district court would not be required to perform a *Daubert* analysis as to whether the photographs accurately reflected the subject matter depicted, even though digital technology is relatively new as compared to a traditional film camera.

Absent some specific objection to the technology underlying the digital equipment, a court is not required to take testimony as to how the equipment works. If the party opposing the exhibit has doubts as to whether the matter in question is what its proponent claims, the proper objection would arise under Rule

---

[6] "Whether a particular fingerprint device or machine generates an accurate fingerprint image involves an inquiry as to whether there is sufficient evidence to authenticate the accuracy of the image and the reliability of the machine. Authentication or identification is an aspect of relevancy that is another condition precedent to admissibility. The requirement of authentication is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Fed. R. Evid. 901(a). Although authentication of pictures or images most often is established through eyewitness testimony that the picture accurately depicts the scene or expert testimony that the picture was generated by a reliable imaging process, Fed. R. Evid. 901(b)(4) provides that authentication may be established by internal patterns or other distinctive characteristics, taken in conjunction with the circumstances. The characteristics of the offered item itself, considered in light of the circumstances, authenticates the item." (citation omitted)

901, not Rule 702/*Daubert*. This is not to say, in the right case, the technology underlying the data collection equipment might be sufficiently cast into doubt to require a *Daubert* hearing. But every case involving equipment—whether it be computers, cameras, or speed guns—does not automatically require a *Daubert* hearing regarding the physics behind the operation of the machine.

The question we must answer, then, is whether the government laid a sufficient foundation for the fingerprint cards under Rule 901, a question we review for abuse of discretion.[7] *United States v. Hernandez-Herrera*, 952 F.2d 342, 343 (10th Cir. 1991). The authenticity of a fingerprint card may be inferred from circumstantial evidence adduced at trial. *Id.* at 344. Under the facts of this case, we have no difficulty in holding that the government presented sufficient circumstantial evidence that the fingerprint cards accurately reflected Lauder's prints, and therefore "[a]ny possible lack of proof connecting [the fingerprint card] with the defendant was a matter for the jury to consider." *Id.* at 345 (citations omitted).

---

[7] Even though Lauder does not argue Rule 901 on appeal, we exercise our discretion to answer this question because, as discussed, the admissibility of the fingerprint cards, properly framed, falls within the Rule 901 framework and not *Daubert*. Furthermore, we note that Lauder's first objection at trial appears to have been on foundation grounds, and only later did he invoke *Daubert*. *See* Aple. App. Supp. II, at 325 (when asked to give a reason for objection to the fingerprint cards, replying that "I [don't] think there is sufficient basis for . . . admission of this item"). Thus, this issue was sufficiently preserved for our review.

The DEA agent who took Lauder's fingerprints testified at trial that he created the fingerprint cards using the live-skin device, and that the device required him to type his name as the agent taking the fingerprints. The agent then submitted the fingerprint cards to the DEA lab in Dallas, Texas, and asked that they be compared to any fingerprints that might have been found as a result of the Task Force's raid. He also testified the live-skin device was functioning properly during the time in question and "the machine checks itself and there's certain qualitites that every print roll has to have for the computer program to accept that print." Aple. Supp. App. II, at 324. In addition to the agent's testimony, Zadow stated that when she received the fingerprint cards, she put her initials and case number on them, and at trial she recognized the cards as the ones she used to perform a comparison to the latent print found on the plastic bag using customary processes. In response to voir dire, she also stated that potential smudges on the glass plate would not undermine the ability of the machine to record an accurate print.

Our conclusion is bolstered by other courts that have considered this question. The Fourth Circuit, for example, has held that fingerprint cards can be authenticated under Rule 901(b)(4)'s "distinctive characteristics" language, which allows authentication by reference to "internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances." *United States v.*

-22-

*Patterson*, 277 F.3d 709, 713–14 (4th Cir. 2002). In *Patterson*, the Fourth Circuit

considered a case with facts strikingly similar to the case at bar. There, the

defendant alleged that the district court erred in admitting fingerprint cards

produced by a machine called a Digital Biometrics Tenprinter. Like the live-skin

device, the Tenprinter used a laser scanner to produce a digital image of the

subject's fingerprints. At trial, the government's expert testified that one of the

defendant's prints generated by the Tenprinter matched a print recovered from a

bag containing crack cocaine at the crime scene. *Id.* at 712. In discussing

whether the government had laid a sufficient foundation for admission of the

fingerprint cards, the court looked to case law applying Rule 901 to photographic

evidence. The court stated that even though the government witness could not

explain how the machine worked or verify that the fingerprints were accurately

rendered on the Tenprinter image, the fingerprints cards were nevertheless

admissible:

> An adequate foundation was provided . . . by "internal patterns[ ] or
> other distinctive characteristics, taken in conjunction with
> circumstances." Fed. R. Evid. 901(b)(4). Specifically, the testimony
> that one of the fingerprints recorded by the Tenprinter matched the
> fingerprint recovered from the drug container, if credited by the jury,
> provided compelling evidence that the Tenprinter reliably imaged
> Patterson's fingers; the alternative—that the machine generated an
> inaccurate fingerprint image that happened to be identical to a
> fingerprint recovered by a different person using a different process
> in a different location—is simply implausible. *See People v. Webb*, 6
> Cal. 4th 494, 24 Cal. Rptr. 2d 779, 862 P.2d 779, 798 (Cal. 1993) (en
> banc). Accordingly, the introduction of this evidence provides no

basis for relief.

*Id.* at 713–14.

We agree with this reasoning and hold that the district court did not abuse its discretion in admitting the fingerprint cards into evidence. Trial testimony by the DEA agent and the expert, Zadow, provided evidence that Lauder's known fingerprint was properly recorded, that the live-skin method functioned properly when it recorded Lauder's print, and that the chain of custody was maintained. To the extent this testimony was still doubtful in authenticating the fingerprint cards—and we do not hold that it was—the fact that the known print was matched to a print taken from the crime scene is compelling evidence the cards were what its proponent claimed. Fed. R. Evid. 901(a) and (b)(4).

**D. Sentencing Issues**

Lastly, Lauder challenges two aspects of the district court's sentencing decision. First, he alleges the district court erred in the amount of illegal drugs it attributed to Lauder for sentencing purposes. Second, he argues his sentence violates the Sixth Amendment as recently interpreted by *United States v. Booker*, —U.S. —, 125 S. Ct. 738 (2005).

*1. Drug amount attributable to Lauder*

At sentencing, the district court used the Drug Equivalency Tables in USSG § 2D1.1 to determine the amount of drugs involved in the drug distribution

conspiracy. Adhering to findings in the PSR, the court concluded that the conspiracy entailed 10,346 kilograms of marijuana, all of which was attributed to Lauder for sentencing purposes. According to Lauder, he should have only been held responsible for the amount of cocaine buried in the backyard (745 grams) because "none of the other drugs found in this case have a nexus, link, or connection to Mr. Lauder." Aplt. Br. at 20.

We review a sentencing court's determination of the quantity of drugs attributable to a defendant for clear error. *United States v. Morales*, 108 F.3d 1213, 1225 (10th Cir. 1997). USSG § 1B1.3(a), which deals with relevant conduct for sentencing purposes, states that

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity . . . , all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity [are relevant conduct for sentencing purposes].

In a controlled substances case, a defendant is "accountable for all quantities of contraband with which he was *directly involved* and, in the case of a jointly undertaken criminal activity, all *reasonably foreseeable* quantities of contraband that were within the scope of the criminal activity that he jointly undertook." USSG § 1B1.3 comment. (n.2) (emphasis added). The government must prove the amount of drugs attributable to each defendant by a preponderance of the

evidence. *Morales*, 108 F.3d at 1226.

As demonstrated by our discussion above regarding the sufficiency of the evidence, the district court did not clearly err in finding that Lauder was either "directly involved" with the drugs attributed to him, or, at the least, that the amounts were "reasonably foreseeable quantities . . . that were within the scope of criminal activity jointly under[taken]." USSG § 1B1.3 comment. (n.2). Furthermore, in calculating drug amounts, the district court followed the procedure outlined in § 2D1.1 of the sentencing guidelines, including the directive to "approximate the quantity" where the amount of drugs seized does not reflect the scale of the offense. USSG § 2D1.1 comment. (n.12). We therefore decline to grant any relief to Lauder on this ground.

### 2. *United States v. Booker*

Finally, Lauder urges us to remand his case for resentencing in light of *United States v. Booker*, —U.S.—, 125 S. Ct. 738 (2005). In *Booker*, the Supreme Court applied its opinion in *Blakey v. Washington*, —U.S.—, 124 S. Ct. 2531 (2004), to the federal sentencing guidelines, holding that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. Justice Breyer's remedial opinion in *Booker*

-26-

then excised portions of the Sentencing Reform Act of 1984, codified at 18 U.S.C. § 3551 et seq., thus rendering the sentencing guidelines advisory. *Id.* at 757. Accordingly, prior to *Booker*, a district court could potentially make two distinct types of error:

> First, a court could err by relying upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily. As *Booker* makes clear, the Sixth Amendment prohibits this practice. 125 S. Ct. at 756. . . . Second, a sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction. *Id.* at 769. While this type of sentence does not violate the Sixth Amendment, *id.*, such a sentence is nonetheless impermissible because the Court severed the portion of the Sentencing Reform Act that required the mandatory application of the Guidelines, *id.* at 764.

*United States v. Gonzalez-Huerta*, 403 F.3d 727, 731–32 (10th Cir. 2005).

Lauder argues that his case involves the first kind of error, so-called "constitutional *Booker* error." *Id.* Specifically, he alleges the district court violated his Sixth Amendment right to a jury trial by finding facts regarding drug quantity amounts. The jury convicted Lauder of possession with the intent to distribute "50 grams and more" of crack cocaine and "500 grams and more" of powder cocaine, which is the equivalent of 1,100 kilograms of marijuana under the sentencing guidelines. *See* USSG § 2D1.1. Based on this amount, when combined with his Category I criminal history, Lauder's guideline range would

have been 151 to 188 months.[8]  The district court, however, over Lauder's objections, attributed additional crack and powder cocaine amounts that, when converted, totaled 10,346 kilograms of marijuana.  This put Lauder's guideline range at 235 to 293 months.

Although Lauder contested the factual basis for the drug amounts attributed to him, he did not assert a constitutional objection during sentencing.  We therefore review the district court's sentence for plain error.  *Gonzalez-Huerta*, 403 F.3d at 732.  To meet this standard, Lauder must show that the district court (1) committed error, (2) that the error was plain, and (3) that the plain error affected his substantial rights.  *United States v. Cotton*, 535 U.S. 625, 631 (2002).  If these three criteria are met, then (4) we may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of the judicial proceedings.  *Id.* at 631–32.  However, we apply these factors "less rigidly when reviewing a potential constitutional error."  *United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005) (quoting *United States v. James*, 257 F.3d 1173, 1182 (10th Cir. 2001)).

---

[8] In a case such as this where the jury's verdict does not find a specific amount of drugs attributable to the defendant, we must assume the only amounts found unanimously by the jury are those specifically alleged in the indictment. *See United States v. Magallanez*, —F.3d—, No. 04-8021, 2005 WL 1155913, at *7 (10th Cir. May 17, 2005).

### (a)    Prongs One and Two

Applying this analysis, it is readily apparent the first two prongs are met. Lauder never admitted to the judge-found drug quantities, and the resulting sentence, mandatorily imposed, exceeded the maximum authorized by the jury verdict.  Thus, the district court committed constitutional error.  *Booker*, 125 S. Ct. at 756; *Magallanez*, 2005 WL 1155913, at *9.  Although Lauder was sentenced in accordance with well-settled law, the error is plain because it is clear and obvious at the time of his appeal.  *Gonzalez-Huerta*, 403 F.3d at 732 (citing *Johnson v. United States*, 520 U.S. 461, 468 (1997)).  Thus, as in most *Booker* appeals, Lauder's potential resentencing rests on application of the third and fourth plain error prongs.

### (b)    Third Prong

To satisfy the third prong, Lauder must demonstrate that the sentencing error affected his substantial rights, which "usually means that the error must have affected the outcome of the district court proceedings."  *Cotton*, 535 U.S. at 632.  To meet this burden, Lauder must show "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 124 S. Ct. 2333, 2339 (2004) (citations and quotation omitted).  In constitutional *Booker* error cases, we have held that there are at least two ways a defendant can make the required showing:

-29-

First, if the defendant shows a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence, then the defendant successfully demonstrates that the error below affected his substantial rights. This inquiry requires the appellate court to review the evidence submitted at the sentencing hearing and the factual basis for any objection the defendant may have made to the facts on which the sentence was predicated. Second, a defendant may show that the district court's error affected his substantial rights by demonstrating a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the district court judge would reasonably impose a sentence outside the Guidelines range. For example, if during sentencing the district court expressed its view that the defendant's conduct, based on the record, did not warrant the minimum Guidelines sentence, this might well be sufficient to conclude that the defendant had shown that the *Booker* error affected the defendant's substantial rights.

*Dazey*, 403 F.3d. at 1175; *see also United States v. Clifton*, —F.3d.—, No. 04-2046, 2005 WL 941581, at *6 (10th Cir. April 25, 2005).

We need not resolve whether Lauder can satisfy his burden under the third prong if he cannot show that the constitutional error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Cotton*, 535 U.S. at 632–33; *Gonzalez-Huerta*, 403 F.3d at 736. In this case, Lauder cannot satisfy his burden under the fourth prong, and we therefore need not address whether the constitutional error affected his substantial rights.

### (c)     Fourth Prong

Lauder bears the burden of showing the *Booker* error seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *Gonzalez-*

-30-

*Huerta*, 403 F.3d at 736. We have, to date, identified numerous non-exclusive factors that can guide our fourth prong analysis. First, we have noted that constitutional *Booker* errors will be noticed more freely. *Clifton*, 2005 WL 941581, at *6 (citations omitted). Another relevant inquiry is the relative strength or weakness of the evidence supporting the defendant's sentence under the sentencing guidelines. *Id.* (citations omitted). Next, we may consider whether the *Booker* error substantially increased the defendant's sentence. *Id.* (citations omitted). And, more recently, we have noted two additional factors: "a showing that objective consideration of the [21 U.S.C.] § 3553(a) factors warrants a departure from the sentence suggested by the Guidelines," and "other evidence peculiar to the defendant that demonstrates a complete breakdown in the sentencing process." *United States v. Dowlin*, —F.3d—, Nos. 03-8038, 03-8055, 2005 WL 1155882, at *18 (10th Cir. May 17, 2005) (citations omitted).

In conducting our fourth prong analysis, we remain mindful that the district court's error in this case was not its reliance on judge-found facts in sentencing. Indeed, after *Booker*, it is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance Lauder's sentence *mandatorily*. *Booker*, 125 S. Ct. at 750 ("If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than

-31-

required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment."); *United States v. Lawrence*, 405 F.3d 888, 906 (10th Cir. 2005). Therefore, another important fourth prong consideration is "[w]hether the district court would simply reimpose the same sentence on remand, or whether instead the sentence would likely change to a significant degree if the case were returned to the district court for discretionary sentencing." *Id.* at 907 (citations and quotations omitted).

Addressing this last consideration first, there is nothing in the record which suggests the district court believed a sentence below the guidelines range would be appropriate. The record is simply silent on this point. The actual sentence imposed by the court, however, indicates an exercise of discretion. Having identified the guideline range as between 235 to 293 months, the district court sentenced Lauder to five months above the bottom of the range. As we noted in *Lawrence*, a sentence above the bottom of the range is an indicator that the district court would simply reimpose the same sentence on remand, and therefore core notions of justice would not be offended if we declined to notice the error. 405 F.3d at 908 (declining to notice the constitutional *Booker* error because, among other things, the defendant was sentenced two months above the bottom of the guideline range). Here, then, given the actual sentence, Lauder does not demonstrate the district court would act differently in a discretionary

environment.

Additionally, looking to the strength or weakness of the evidence supporting Lauder's sentence, all of the judge-found drug amounts rested on direct evidence offered at trial, either physical evidence recovered by the raid or testimony from cooperating witnesses. *See Magallanez*, 2005 WL 1155913, at *9 (declining to notice constitutional *Booker* error in part because "[t]he court based its assessment of drug quantity on the evidence at trial, totaling up all drug quantities specifically linked by witnesses to [the defendant]"). The judge, in fact, stated at Lauder's sentencing hearing that "I do think the amounts are justified." Aple. Supp. R.O.A., at 12. Although Lauder contested the drug amounts testified to by Soleil Sligh, he offered no evidence to rebut her testimony. As the judge stated, "Well, the jury basically believed her. I don't think there's much question about that." *Id.* at 7.

These statements, in our view, are further evidence the judge would merely reimpose the same sentence were we to remand this case for resentencing. In fact, the record actually supports a finding of *more* drugs than the district court attributed to Lauder at sentencing. The PSR, for example, failed to take into account ten additional ounces of crack cocaine (283.5 grams) that could have been attributed to Lauder based on trial testimony. The PSR's oversight, had it been noticed by the district court, would have substantially increased Lauder's

sentencing guideline range.

Finally, there is no evidence in the record that an objective application of the 21 U.S.C. § 3553(a) factors would support a departure from the Guidelines in this case, nor that this case presents peculiar evidence demonstrating a breakdown in the sentencing process. Indeed, only one factor weighs in Lauder's favor, which is that the judge-found facts substantially increased the applicable guideline range. The drug quantity amounts found by the judge increased Lauder's base sentence range by 84 months, which, in our view, is a substantial increase. Nonetheless, this one factor—like any of the factors we have identified in our prior cases—is not dispositive, especially given the essentially unrebutted evidence relied on by the district court.

In sum, Lauder has not shown that the constitutional error in this case seriously affected the fairness, integrity, or public reputation of the judicial proceedings. The actual sentence (five months above the bottom of the guideline range), direct evidence supporting the judge-found quantity amounts, and statements by the district court persuade us that a remand in this case would only result in the reimposition of the same sentence. We therefore decline to notice the error, and affirm Lauder's sentence.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the conviction and sentencing on all counts.