**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 2, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

JUAN RODRIGUEZ-FELIX,

        Defendant-Appellant.

No. 05-2142

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CR-04-665-WJ)**

---

James E. Bierly, Albuquerque, New Mexico, for Appellant.

Laura Fashing, Assistant United States Attorney, Office of the United States Attorney, Albuquerque, New Mexico, for Appellee.

---

Before **LUCERO** , **McWILLIAMS** , and **TYMKOVICH** , Circuit Judges.

---

**TYMKOVICH** , Circuit Judge.

---

Juan Rodriguez-Felix claims he is the victim of mistaken identification at his trial for distributing cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). He was convicted based in large part on extensive trial testimony from multiple eyewitnesses. To dispute this evidence, Rodriguez-Felix sought to

introduce expert testimony on the general reliability of the prosecution's eyewitnesses. The district court disallowed the proposed expert testimony, finding it to be unreliable, and consequently limited rebuttal of the eyewitness testimony solely to cross-examination.

Following the convictions, the district court sentenced Rodriguez-Felix to 154 months imprisonment. He appeals his conviction and sentence, arguing (1) the district court should have allowed the proffered expert testimony on the general reliability of eyewitness identification, (2) the court improperly excluded proposed photographic evidence, (3) the evidence was insufficient for a jury to find him guilty beyond a reasonable doubt, and (4) the court's reliance on judge-found facts to enhance his sentence violated the Sixth Amendment.

Having jurisdiction pursuant to 28 U.S.C. § 1291 and finding no legal error, we affirm.

## I. Background

Victoriano Villegas was hired by the Gallup, New Mexico police department as a confidential informant. As part of a drug investigation, Villegas met a local dealer known by the name of "Jilli" on three separate occasions in June and July 2003. After their initial meeting, Villegas arranged for two subsequent meetings accompanied by undercover Gallup police officers.

On July 22, 2003, the first of these meetings occurred when undercover

agent Sal Acevedo accompanied Villegas to a gas station. There, both men met Jilli in the back seat of his car and purchased cocaine. During this meeting, a police officer conducting surveillance recorded the car's license plate. Based on this information, two police officers stopped Jilli later that night for a broken taillight. During this traffic stop, which was videotaped, Jilli identified himself as Juan Rodriguez. The officers did not arrest Jilli at this time.

The second purchase occurred on July 29, 2003. Again, Agent Acevedo accompanied Villegas to a parking lot. Jilli arrived in the same vehicle he was driving on July 22. The men entered the car and bought cocaine. Agent Acevedo then offered to fix the car's broken taillight. Jilli agreed, and led Villegas and Agent Acevedo to his trailer home about a block away. When they failed to fix the taillight, Agent Acevedo and Villegas departed. A week later, an officer conducting surveillance snapped a photograph of Jilli in front of this residence.

It was not until March 2004, when Rodriguez-Felix was arrested for an unrelated crime, that Jilli was identified as Juan Rodriguez-Felix. At that time, Agent Acevedo viewed a photograph taken of Rodriguez-Felix after his arrest and identified Rodriguez-Felix as the person known as Jilli and from whom he had purchased drugs in July 2003.

## II. Analysis

Rodriguez-Felix maintains both that his conviction is in error and that his

sentence is improper. His conviction, he argues, should not stand because the district court denied him his right to present a defense. Moreover, he asserts his conviction is unsupported by the facts presented to the jury. Finally, even if his conviction is proper, he suggests the district court's reliance on judge-found facts to enhance his sentence violated his Sixth Amendment right to a jury trial.

### A. Admissibility of Evidence

The right to present a defense is anchored in the "Fifth and Fourteenth Amendment right to due process and the Sixth Amendment right to compulsory process." *United States v. Solomon*, 399 F.3d 1231, 1239 (10th Cir. 2005). Because "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense," due process guarantees are implicated whenever the exclusion of evidence acts to obstruct this right. *Taylor v. Illinois*, 484 U.S. 400, 408 (1988). But the opportunity to present evidence is not unfettered—a district court's resolution of evidentiary questions is constrained by the twin prongs of relevancy and materiality, and guided by the established rules of evidence and procedure. *Solomon*, 399 F.3d at 1239; *see Holmes v. South Carolina*, 126 S. Ct. 1727, 1732 (2006) (noting that rules of evidence must advance legitimate interests and be proportionate to the truth-seeking goals they are designed to serve).

Rodriguez-Felix argues the district court denied him this right to present a

defense in two ways: (1) excluding testimony from an expert witness regarding the reliability of eyewitness identification; and (2) rejecting a request for an in-court photograph of Rodriguez-Felix standing back-to-back with Officer Ganoa.

### 1. Expert Testimony

Rodriguez-Felix's principal argument is that the district court improperly excluded expert testimony regarding the general reliability of eyewitness identification. In making this argument, he claims two errors: (1) the district court improperly rejected his proffered expert psychologist on eyewitness identification on the grounds that the expert had not shown his testimony would meet the reliability standards set forth in *Daubert*; and (2) the court should have authorized adequate payment in order for his expert to testify at the *Daubert* hearing.

Prior to trial, Rodriguez-Felix disclosed his intention to call as a defense witness Dr. Steven E. Clark, a university professor with expertise in the "memory and decision processes which underlie eyewitness identification decisions." Dr. Clark proposed to testify regarding "the factors relevant to consider in evaluating the reliability of eyewitness identification," including conditions of observation, events subsequent to the crime but prior to the identification, and procedures used in obtaining the identification. Summ. of Test. at 1. His curriculum vitae further

states that he had "recently developed a model of the memory and decision processes which underlie eyewitness identification decisions," allowing for "quantitative predictions for response probabilities in eyewitness identification experiments." It notes he is still in the process of refining and testing this model. Curriculum Vitae at 1.

After reviewing the proffered testimony, the district court excluded Dr. Clark, finding that his proffer did not meet the minimal *Daubert* standards required for expert testimony. We review de novo the question of whether the district court employed the proper legal standard and performed its gatekeeper role in admitting expert testimony. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003). But the court's actual application of this standard in deciding whether to admit or exclude an expert's testimony is reviewed for abuse of discretion. *Id.* The district court retains broad discretion in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability. *Id.* We therefore reverse only if the district court's conclusion is "arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (internal quotation marks omitted).

*Admissibility of the Testimony*

-6-

In evaluating the admissibility of expert testimony, trial courts are guided by a trilogy of Supreme Court cases: *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); and *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997). Together these cases clarify the district court's gatekeeper role under Federal Rule of Evidence 702. *United States v. Lauder*, 409 F.3d 1254, 1262 (10th Cir. 2005). Under Rule 702, a district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony. *See* Fed. R. Evid. 702 ("If scientific, technical, or other specialized *knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue, a *witness qualified as an expert* by knowledge, skill experience, training or education may testify" at trial.) (emphasis added).

In reviewing whether an expert's testimony is reliable, the trial court must "assess the reasoning and methodology underlying the expert's opinion . . . ." *Dodge*, 328 F.3d at 1221 (quoting *Daubert*, 509 U.S. at 592–93). "[A]n expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'" *Id.* at 1222 (quoting *Daubert*, 509 U.S. at 590). The Supreme Court in *Daubert* listed four nonexclusive factors

that a trial court may consider in making its reliability assessment: (1) whether the theory at issue can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *Dodge*, 328 F.3d at 1222.

Assuming this reliability prong is met, the court will still consider other non-exclusive factors to determine whether the testimony will assist the trier of fact: (1) whether the testimony is relevant;[1] (2) whether it is within the juror's common knowledge and experience;[2] and (3) whether it will usurp the juror's role of evaluating a witness's credibility.[3] In essence, the question is "whether [the]

---

[1] *See, e.g.*, *Daubert*, 509 U.S. at 591 (noting that Rule 702's requirement that expert testimony assist the jury "goes primarily to relevance"); *United States v. Arney*, 248 F.3d 984, 990 (10th Cir. 2001) (same).

[2] *See, e.g.*, *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991) (noting that "Rule 702 . . . dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject"); *United States v. Welch*, 368 F.3d 970, 974 (7th Cir. 2004) (noting that "[w]here expert testimony addresses an issue of which the jury is already generally aware, such testimony does not assist the jury") (internal marks omitted), *overruled on other grounds*.

[3] *See, e.g.*, *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (noting that "in reviewing the use of expert testimony, we also look to see if it will usurp . . . the role of the jury in applying [the applicable] law to the facts
(continued...)

-8-

reasoning or methodology properly can be applied to the facts in issue." *Daubert*,

509 U.S. at 593.

Expert evaluation of eyewitness testimony—in the abstract—may serve a

critical trial function where the identification of a defendant is in dispute. No one

disputes that an eyewitness's identification of a defendant can create a significant

impact at trial. *See generally* Elizabeth F. Loftus & James M. Doyle, *Eyewitness*

*Testimony* § 1-1 (3d ed. 1997 & Supp. 2005) (suggesting that defendants'

conviction rates substantially increase when an eyewitness testifies). But modern

research also recognizes that an eyewitness's identification may be subject to

significant witness error or manipulation. This research points to a number of

factors that are helpful to evaluating the reliability of an eyewitness's

identification of a suspect, *e.g.*, the training and confidence of the witness,[4] the

duration between the encounter with the suspect and the witness's identification,[5]

---

[3](...continued)
before it") (internal quotation marks omitted).

[4] Studies suggest that experienced police officers are better witnesses: they exhibit better recall of descriptive facts and are less prone to error. Loftus & Doyle, *supra* at § 2-15. Relatedly, studies also show that despite jurors' belief to the contrary, a more confident eyewitness is not necessarily a more accurate eyewitness. *Id.* at §§ 1-3, 3-12.

[5] Not surprisingly, a witness's memory fades over time. One study suggests that "[w]ith a single encounter lasting a brief period, [facial memory trace] has been estimated to be effectively gone in less than a year." *Id.* at § 3-2.

the use of surveillance videos,[6] unconscious transference,[7] and cross-racial identification.[8] *See generally id.* at §§ 2-1 to 4-13 (describing the myriad factors potentially influencing an eyewitness's identification). Initially, courts were skeptical of this research, and almost uniformly rejected it. Many courts now, however, are proving receptive to admitting testimony based on this research.

We explored the admissibility of expert testimony on the reliability of eyewitness identifications most recently in *United States v. Smith*, 156 F.3d 1046, 1052 (10th Cir. 1998). We rejected a per se rule excluding such expert testimony, noting the emerging debate over this type of evidence: "Until fairly recently, most, if not all, courts excluded expert psychological testimony on the validity of eyewitness identification. But, there has been a trend in recent years to allow such testimony under circumstances described as 'narrow.'" *Id.* at 1052–53 (quoting *United States v. Harris*, 995 F.2d 532, 534 (4th Cir. 1993)). We listed some of the limited conditions under which this expert testimony could be

---

[6] Recent research indicates that identifications from surveillance videos might not be as reliable as once thought. "The indications are that people viewing a surveillance type video are prone to rely on superficial resemblances in making misidentifications." *Id.* at § 4-12(a).

[7] Unconscious transference refers to the "phenomenon in which a person seen in one situation is confused with or recalled as a person seen in a second situation." *Id.* at § 4-10.

[8] "It is well-established that there exists a comparative difficulty in recognizing individual members of a race different from one's own." *Id.* at § 4-9.

appropriately admitted, emphasizing that the particular facts of a case drive the analysis: "The narrow circumstances held sufficient to support the introduction of expert testimony have varied but have included such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and [such] psychological phenomena as the feedback factor[9] and unconscious transference." *Id.* at 1053 (quoting *Harris*, 995 F.2d at 535). In short, subject to the trial court's careful supervision, properly conceived expert testimony may be admissible to challenge or support eyewitness evidence.

The majority of other circuits also reject per se exclusion of this type of expert testimony. *See United States v. Brien*, 59 F.3d 274, 277 (1st Cir. 1995); *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *United States v. Stevens*, 935 F.2d 1380, 1400–01 (3d Cir. 1991); *United States v. Harris*, 995 F.2d 532, 534–35 (4th Cir. 1993); *United States v. Moore*, 786 F.2d 1308, 1312–13 (5th Cir. 1986); *United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir. 1984); *United States v. Hall*, 165 F.3d 1095, 1106–07 (7th Cir. 1999); *United States v. Blade*, 811 F.2d 461, 465 (8th Cir. 1987); *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994). *But see United States v. Smith*, 122 F.3d 1355,

---

[9] Feedback factor describes the phenomenon whereby "witnesses who discuss the case with each other may unconsciously reinforce mistaken identifications and their certainty in these identifications." *Harris*, 995 F.2d at 535 n.2 (quotation omitted).

1357–59 (11th Cir. 1997) (reaffirming earlier precedent creating a per se rule of inadmissibility).

The rejection by these courts, as well as our own, of a per se approach to expert testimony on eyewitness identification reflects *Daubert*'s liberal definition of what constitutes reliable, scientific knowledge. Conversely, confinement of such testimony to limited circumstances reflects *Daubert*'s admonition that expert testimony assist the jury—indeed, an expert's testimony describing how certain factors, falling outside a typical juror's experience, may affect a eyewitness's identification is the very type of scientific knowledge to which *Daubert*'s relevance prong is addressed.

But outside these specialized circumstances, expert psychological testimony is unlikely to assist the jury—skillful cross-examination provides an equally, if not more, effective tool for testing the reliability of an eyewitness at trial. *See Smith*, 156 F.3d at 1053 (recognizing that cross-examination is an effective tool to combat the evils of a mistaken identification); *Hall*, 165 F.3d at 1107 (same); *cf. United States v. Thoma*, 713 F.2d 604, 607–08 (10th Cir. 1983) (recognizing that jury instructions serve as an effective tool to combat the evils of a mistaken identification). Jurors, assisted by skillful cross-examination, are quite capable of using their common-sense and faculties of observation to make this reliability determination. *Smith*, 156 F.3d at 1053. *See generally*, Loftus & Doyle, *supra* at

§§ 10-1 to 10-30 (detailing the process to most effectively cross-examine an eyewitness). Nonetheless, we remain cognizant that while cross-examination is often effective, expert testimony, when directed at complex issues, may provide a more effective tool for rebutting an eyewitness's testimony. *See, e.g.*, *United States v. Mathis*, 264 F.3d 321, 342 (3d Cir. 2001) (finding abuse when the district court excluded a psychologist's testimony on eyewitness identification which included "matters that would [not] necessarily be apparent to jurors" and where the court found it "difficult to comprehend how [the matter] might be elucidated through cross-examination"). With these guidelines in mind, we analyze below the district court's exclusion of Dr. Clark's testimony.

Because Rodriguez-Felix does not allege the district court failed to employ the proper legal framework required by *Daubert*, we consider only whether the district court abused its discretion in actually applying this framework to the testimony at hand. The district court first addressed the question of whether Dr. Clark's proposed testimony met the reliability component of *Daubert*. It concluded:

> [W]hat's been submitted is woefully inadequate in . . . allowing me to assess the reasoning and methodology underlying the expert's opinion and to determine whether it is both scientifically valid and applicable to a particular set of facts. And also, those factors listed by the U.S. Supreme Court, it just—there's been nothing in this record that allows me to make that determination.

We agree. On a fundamental level, Dr. Clark's report is unclear as to

whether his testimony would rely on his own research or that of other psychologists. In either case, the report was insufficient to allow the district court to "assess the reasoning and methodology underlying the expert's opinion. . . ." *Dodge*, 328 F.3d at 1221 (quoting *Daubert*, 509 U.S. at 592–93). The description of Dr. Clark's research is wholly inadequate—it fails to indicate whether it has been subjected to peer review, whether it has been published, and whether it has been accepted by other psychologists in the field. Indeed, Dr. Clark states that he is currently in the process of testing his theory. Additionally, other than generalized assertions regarding the factors which can affect an eyewitness's identification, the report fails to sufficiently reference specific and recognized scientific research, which underlies Dr. Clark's conclusions, such that the court could determine if this foundational research had been subjected to peer review, and, if so, whether it had been accepted in the community. The requirements of *Daubert* are not satisfied by casual mention of a few scientific studies, which fail to demonstrate that an expert's conclusions are grounded in established research, recognized in the scientific community, or otherwise accepted as scientific knowledge. In short, we find nothing on this record to suggest that the district court abused its discretion by excluding Dr. Clark's testimony.

The district court also addressed the second component of a *Daubert*

analysis—relevancy—concluding that it had "concerns on whether this type of testimony would assist the trier of fact . . . ." On a superficial level, the testimony is plausibly relevant since the question of whether the multiple eyewitness identifications of Rodriguez-Felix were reliable was a key issue at trial. But the more fundamental inquiry is whether such testimony fell outside the juror's common knowledge and experience. Here, we find that it did not.

Rodriguez-Felix had abundant opportunity to cross-examine each of the prosecution's eyewitnesses at length. *See Smith*, 156 F.3d at 1053; *Hall*, 165 F.3d at 1107. With each witness he challenged their identification, highlighting in particular the lengthy period of time that lapsed between the eyewitnesses's encounters with Jilli and their ultimate identification of Rodriguez-Felix. In these circumstances, cross-examination amply exposed the common-sense deficiencies in the prosecution's identification case. The district court, in sum, did not abuse its discretion in disallowing Dr. Clark's testimony.

In any event, the exclusion of the evidence, at worst, would have been harmless. At trial, four witnesses testified as to Rodriguez-Felix's identity. But, more importantly, the jury itself was able to confirm his identity from the videotape of the traffic stop and the photograph of Jilli outside his trailer. *See Welch*, 368 F.3d at 975 (noting that additional support for a finding of no abuse included the jury's "excellent opportunity to determine personally whether they

believed the eyewitness testimony that [the defendant] was the individual depicted in the bank's surveillance videotapes"); *see also Smith*, 156 F.3d at 1053–54 (finding no abuse where "there were five eyewitness identifications, not one," as well as additional evidence of guilt unrelated to the eyewitness identifications); *United States v. Villiard*, 186 F.3d 893, 895 (8th Cir. 1999) (finding no abuse of discretion in denying expert eyewitness identification testimony because the government's case did not rest exclusively on uncorroborated eyewitness testimony).

And had Dr. Clark testified, he would have offered only unremarkable conclusions, most of which would have bolstered the government's case: the expert's proffer states that the conditions were "very good" for the eyewitnesses to identify the suspect as "[t]he witnesses appeared to have had multiple encounters with the target person, under low-stress conditions, at a short distance, in daylight (at least sometimes)." Summ. of Test. at 1. In short, because each eyewitness's identification of Rodriguez-Felix was corroborated by an "evidentiary cornucopia," any error would have been harmless. *Smith*, 156 F.3d at 1053 (quoting *Harris*, 995 F.2d at 535).

Accordingly, the district court did not abuse its discretion in applying the *Daubert* analysis, and even if it had, we find any error harmless.

*Denial of Access to Expert Testimony*

Rodriguez-Felix also argues that the district court erred by not authorizing adequate payment for Dr. Clark to testify at the *Daubert* hearing. If the court had done so, Rodriguez-Felix claims, Dr. Clark would been able to convince the court that his credentials and the research on which he would ground his testimony satisfied the minimal *Daubert* standards. We find no error in the court's failure to authorize additional compensation for Dr. Clark.

First of all, given the court's determination on reliability, the amount of compensation authorized for Dr. Clark's services should not have mattered to the court's conclusions regarding his testimony. But Rodriguez-Felix goes further and suggests his due process rights were compromised when the district court denied his ability to have Dr. Clark available to testify. He bases his argument on the Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985), which held that the "Fourteenth Amendment's due process guarantee of fundamental fairness" requires the government to provide an indigent defendant, whose sanity is in question, with access to that psychiatric assistance necessary for preparation of an effective defense. *Id.* at 74. He argues that the logic of *Ake* should be extended to the facts of this case; in particular, the proposed expert psychological testimony.

While *Ake* makes clear that indigent defendants may be afforded psychiatrists at the government's expense, *Ake* has been extended to hold that

other expert services also may be provided so long as the defendant shows that they are a basic tool necessary to an adequate defense.[10] *See Medina v. California*, 505 U.S. 437, 444–45 (1992) (noting that *Ake* "can be understood as an expansion of earlier due process cases holding that an indigent criminal defendant is entitled to the minimum assistance necessary to assure him a fair opportunity to present his defense and to participate meaningfully in the judicial proceeding") (internal marks omitted); *see, e.g.*, *Rojem v. Gibson*, 245 F.3d 1130, 1139 (10th Cir. 2001) (finding defendant failed to make a sufficient showing to appoint an investigator); *Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000) (finding defendant failed to make a sufficient showing to appoint either a jury-selection expert or a mitigation expert); *Castro v. Ward*, 138 F.3d 810, 826 (10th Cir. 1998) (finding defendant failed to make a sufficient showing to appoint an investigator); *Matthews v. Price*, 83 F.3d 328, 335 (10th Cir. 1996) (same); *Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993) (finding that defendant was denied due process when he was not appointed an independent pathologist to rebut evidence of victim's cause of death); *Little v. Armontrout*, 835 F.2d 1240, 1243–45 (8th Cir. 1987) (finding reversible error where the trial court failed to appoint an

---

[10] Federal law provides indigent defendants with "investigative, expert, or other services" where counsel makes a showing that such services are "necessary for adequate representation." 18 U.S.C. § 3006A(e). Rodriguez-Felix did not request the appointment of Dr. Clark pursuant to § 3006A(e), and we therefore do not address the merits of his argument under this provision.

expert on hypnosis to rebut an eyewitness's hypnotically-induced identification);

*cf. Aguilar v. Dretke*, 428 F.3d 526, 534 (5th Cir. 2005) (finding no due process

violation for failure to appoint a ballistics expert since the evidence was neither

critical to the conviction nor subject to varying expert opinion).

We consider three factors in making this necessity assessment:

(1) the effect on [the defendant's] private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered.

*Rojem*, 245 F.3d at 1139. Undeveloped assertions that the requested assistance

would be beneficial are insufficient to meet this burden. *See Allen v. Mullin*, 368

F.3d 1220, 1236 (10th Cir. 2004); *Rojem*, 245 F.3d at 1139.

To be sure, the reliable identification of Rodriguez-Felix was a critical

aspect of the prosecution's case. But *Ake* does not stand for the proposition that

the government should provide an expert witness whenever a contested issue may

be arguably clarified by expert testimony. Instead, the Constitution requires that

indigent defendants be provided with "[m]eaningful access to justice" such that

they receive the "basic tools of an adequate defense or appeal." *Ake*, 470 U.S. at

77; *cf. United States v. Kennedy*, 64 F.3d 1465, 1473 (10th Cir. 1995) (holding the

government was not obligated to provide paralegals, airfare, and an accounting

firm for an indigent defendant accused of fraud where the defendant failed to

-19-

show the value of such services or how their absence would cause substantial prejudice"); *Moore*, 225 F.3d at 503 (holding that the state need not provide a jury consultant to a defendant facing a capital murder charge since "[a]ll competent lawyers are endowed with the 'raw materials' required to pick a jury fairly disposed toward doing substantive justice"). It cannot be emphasized enough that a defendant must play by the same rules of evidence as everyone else, including adherence to the gatekeeping requirements of *Daubert*.

Rodriguez-Felix possessed the basic tools to defend his case. He was given ample opportunity to show he was a victim of misidentification. His counsel effectively challenged each of the eyewitnesses through cross-examination of the basic components of their identification: lapse of time, viewing conditions, and unconscious transference. *See Jackson v. Ylst*, 921 F.2d 882, 886 (9th Cir. 1990) (finding that the appointment of an expert on eyewitness identification "is not required because cross-examination effectively exposes erroneous eyewitness identifications"); *see also Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993) (holding that "something more than a mere possibility of assistance from a requested expert" is necessary to admit the proffered testimony); *Moore v. Tate*, 882 F.2d 1107, 1111 (6th Cir. 1989) (noting that "[w]hile the expert's testimony may well have given the jurors another perspective from which to assess" the eyewitness's testimony, such "perspective was [not] constitutionally required").

Rodriguez-Felix merely speculates that had Dr. Clark been available for the *Daubert* hearing the court would have concluded his qualifications satisfied *Daubert* and thereby allowed him to testify at trial. We are unpersuaded by this chain of reasoning. *See Allen*, 368 F.3d at 1236. Because the facts here compel us to conclude that cross-examination provided Rodriguez-Felix with the "basic tools of an adequate defense," we find the requirements of due process have been satisfied.

* * * * *

In conclusion, the district court did not abuse its discretion in excluding Dr. Clark's proffered testimony. Nor did the court violate the Constitution when it refused to authorize additional compensation in order to allow Dr. Clark's testimony at the *Daubert* hearing. Accordingly, we affirm the district court's evidentiary rulings denying expert psychological testimony on the general reliability of eyewitness identification.

### 2. In-Court Photograph

At trial, the jury watched the videotape from the July 22 traffic stop, which depicted the interaction between Jilli and the two officers conducting the stop. Rodriguez-Felix suggests that the videotape conclusively demonstrates that one of the officers, Benny Ganoa, is shorter than Jilli; Officer Ganoa (5'11"), however, is taller than Rodriguez-Felix (5'7"). After viewing the videotape, the district

court allowed the jury a second opportunity to compare the relative heights of Rodriguez-Felix and Officer Ganoa, requiring the men to stand back-to-back in the courtroom at the conclusion of Officer Ganoa's testimony. The court, however, denied Rodriguez-Felix's request to memorialize this pose with a photograph, ruling that such evidence would be cumulative.

We see no error. The videotape enabled the jury to independently assess the relative heights of these two men at the time of the stop. While a photograph might have visually reinforced the fact that Officer Ganoa is taller than Rodriguez-Felix, the jury had ample opportunity at trial to observe both men and judge for themselves their relative heights. The addition of a photograph showing what the jury already perceived would have added little to what was in plain view. We agree with the court that the evidence was cumulative. *See* Fed. R. Evid. 403 (noting that testimony is properly excluded where it amounts to "needless presentation of cumulative evidence"); *see also* 22 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 5220 (3d ed. 2005) (stating that evidence should not be excluded simply because it is repetitive, but because the "evidence on one side is so full that no jury that rejected it would be likely to change its mind because of the introduction of the proffered evidence"); *see, e.g.*, *Solomon*, 399 F.3d at 1239–40 (finding photographic evidence depicting defendant's injuries merely cumulative as to his intent to possess a firearm where

trial testimony established that defendant was assaulted and remained fearful of a future attack).

Accordingly, we find no abuse of discretion by the district court.

### B. Sufficiency of the Evidence

Rodriguez-Felix next argues the evidence presented to the jury was insufficient to prove beyond a reasonable doubt that he, in fact, is the drug-dealer originally identified as Jilli. In short, he argues that because the videotape evidence from the subsequent traffic stop demonstrates that Jilli is taller than Officer Ganoa, a reasonable jury could not have concluded that Rodriguez-Felix, who is shorter, is the same person.

We review a claim of insufficient evidence de novo, considering the evidence in a light most favorable to the prosecution. *United States v. Muessig*, 427 F.3d 856, 860–61 (10th Cir. 2005). Our inquiry is whether the evidence and all reasonable inferences drawn therefrom would permit a reasonable jury to find the defendant guilty beyond a reasonable doubt. *Id.* In conducting this analysis, we neither weigh conflicting evidence nor consider the credibility of witnesses. *United States v. Pappert*, 112 F.3d 1073, 1077 (10th Cir. 1997).

Here, the evidence is more than sufficient to support the jury verdict. Multiple eyewitnesses involved in the investigation identified Jilli as Rodriguez-Felix: (1) Villegas unequivocally testified at trial that Rodriguez-Felix and Jilli

were the same person, based on their series of meetings in June and July 2003; (2) Officer Couch, one of the officers who questioned Jilli during the traffic stop, testified that the driver of Jilli's car was Rodriguez-Felix; (3) Officer Magnum, a surveillance officer, identified Rodriguez-Felix as leaning up against Jilli's car in a parking lot during the course of the investigation; and (4) Officer Littlefield, another surveillance officer, identified Rodriguez-Felix as standing outside Jilli's residence.

The jury had at its disposal additional evidence establishing Jilli's identity as Rodriguez-Felix: (1) a photograph depicting Jilli outside his residence, (2) the videotape of the traffic stop, and (3) testimony that the driver from the traffic stop identified himself as Juan Rodriguez. With this evidence, the jury could independently assess the officers' accounts of their interactions with Rodriguez-Felix as well as the visual appearance of Rodriguez-Felix from the photographs and videotape.

We acknowledge that a couple of the police officers who had encounters with Jilli during the course of the investigation could not positively identify Rodriguez-Felix as Jilli, and that the eyewitnesses who were able to identify Rodriguez-Felix only did so a year after their initial encounters with Jilli. But a finding of guilty beyond a reasonable doubt does not require every witness to possess perfect memory nor every shred of evidence to point to the defendant's

guilt. We must assume, based on the verdict, that the jury rejected Rodriguez-Felix's characterization of the identity evidence. Because it is the jury's responsibility to weigh conflicting evidence, we view the evidence presented below in the light most favorable to the jury's conclusion. Viewed in this light, a reasonable jury could have found Rodriguez-Felix and Jilli to be the same person.

Accordingly, the evidence presented was sufficient to support Rodriguez-Felix's conviction.

### C. Sentencing Error

Rodriguez-Felix finally argues that the district court relied on judge-found facts to enhance his sentence in contravention of the Supreme Court's recent decisions in *United States v. Booker*, 543 U.S. 220 (2005), and *Blakely v. Washington*, 542 U.S. 296 (2004). In particular, he challenges the district court's calculation of the drug quantities involved in each count of his conviction as well as its use of uncharged relevant conduct. We reject both challenges.

After *Booker*, a constitutional violation lies only where a district court uses judge-found facts to enhance a defendant's sentence *mandatorily* under the U.S. Sentencing Guidelines (USSG), and not where a court merely applies such facts in a discretionary manner. *See United States v. Lauder*, 409 F.3d 1254, 1269 (10th Cir. 2005) ("[I]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the

court's reliance on judge-found facts to enhance [a defendant's] sentence mandatorily.").

Indeed, even after *Booker*, district courts are required to consider the Guidelines as a relevant factor when calculating a defendant's sentence. *Booker*, 543 U.S. at 264. In calculating a sentence, a district court may continue to find facts by a preponderance of the evidence. *United States v. Magallanez*, 408 F.3d 672, 685 (10th Cir. 2005). We review those factual findings for clear error, reversing only if a finding is wholly without factual support in the record, or after reviewing the evidence, we are definitively and firmly convinced that a mistake has been made. *United States v. Williams*, 431 F.3d 1234, 1237 (10th Cir. 2005).

### 1. *Drug Quantity Calculations*

Rodriguez-Felix asserts that the district court erred in calculating the total weight of drugs used in sentencing him. In particular, he argues (1) a special verdict form should have been submitted to the jury to determine the weight of drugs under Count I; and (2) even though a special verdict form was submitted to the jury for Count II, it was nevertheless insufficient to support the district court's finding—the form, instead of specifying an exact weight, specified a range of weights from which the district court presumed a weight at the high end.

Here, the district court sentenced Rodriguez-Felix following the announcement of the *Booker* decision and properly applied the Guidelines in an

advisory fashion. Therefore, because the court did not use judge-found facts to enhance Rodriguez-Felix's sentence *mandatorily*, its factual findings regarding drug quantity are subject to clear error review. At trial, the government produced two reports from forensic chemists detailing the weight of drugs involved in each count. Rodriguez-Felix does not contest the accuracy of these reports. Because the district court's findings were predicated on these uncontested reports, we find no error, clear or otherwise.

## 2. *Use of Uncharged Conduct*

At sentencing, the district court also took into account uncharged conduct other than the crimes of conviction that had been committed by Rodriguez-Felix.[11] In particular, the court found that Rodriguez-Felix had trafficked drugs beyond that alleged in the indictment, and, therefore, increased the total quantity of drugs attributed to Rodriguez-Felix from 37.1 grams to 185.79 grams. This enhancement resulted in a four-level increase in offense level and a minimum, additional 30-months imprisonment. Rodriguez-Felix challenges the use of this uncharged conduct on *Booker* grounds, arguing that such drug quantity findings should have been left to the jury.

---

[11] Pursuant to USSG § 1B1.3(a)(1)(A) and (a)(2), in sentencing a defendant, a district court may consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as acts and omissions committed by the defendant "that were part of the same course of conduct or common scheme or plan as the offense of conviction."

In the aftermath of *Booker*, we have routinely permitted a district court to enhance a defendant's sentence using uncharged conduct proven to the court by a preponderance of the evidence. *See United States v. Garcia*, 411 F.3d 1173, 1177 (10th Cir. 2005) (noting that post-*Booker* "[r]elevant uncharged conduct must be proven by a preponderance of the evidence"). Because the court below did not enhance Rodriguez-Felix's sentence mandatorily, *Booker* does nothing to alter this analysis. And since Rodriguez-Felix does not suggest the court's drug quantity determination is otherwise clearly erroneous, we reject his argument.

### 3. *Presentence Report*

Lastly, Rodriguez-Felix contends the district court should have taken testimony regarding disputed portions of the presentence report (PSR). A district court may not simply adopt the PSR as its findings when the defendant disputes the report. *United States v. Guzman*, 318 F.3d 1191, 1198 (10th Cir. 2003); *see* Fed. R. Crim. P. 32(i)(3) (requiring a court to rule on any disputed portion of the PSR and append a copy of that determination to any copy of the PSR); *see also United States v. Dozier*, 444 F.3d 1215, 1218 (10th Cir. 2006) (holding that Fed. R. Crim. P. 32(h) "requires a court to notify both parties of any intention to depart from the advisory sentencing guidelines as well as the basis for such a departure when the ground is not identified in the [PSR]").

Here, however, Rodriguez-Felix failed to preserve this objection, since he

did not include his objections to the PSR in the record on appeal. *See* 10th Cir. R. 10.3(B) (2006) ("The court need not remedy any failure by counsel to designate an adequate record. When the party asserting an issue fails to provide a record sufficient for considering that issue, the court may decline to consider it."); *see also id.* 10.2(A) ("In appeals in which any appellant is represented by appointed counsel . . . a designation of record must be filed in district court."). We, therefore, decline to address the merits of this argument.

### III. Conclusion

Accordingly, for the above stated reasons, we AFFIRM.