**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 5, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOSHUA WOFFORD,

    Defendant - Appellant.

No. 18-5029
(D.C. No. 4:17-CR-00085-JED-1)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **MORITZ**, and **EID**, Circuit Judges.
_____

Joshua Wofford appeals from his jury conviction for carjacking. *See* 18 U.S.C. § 2119. He argues that (1) the district court erred in admitting eyewitness-identification evidence that he claims was unreliable and based on an unduly suggestive photo lineup; and (2) the district court abused its discretion in excluding his proffered expert testimony about eyewitness-identification evidence. Finding no reversible error on either point, we affirm.

---

[*] This order and judgment isn't binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

## Background

One evening in June 2017, Daisy Ellis and Daniel Harris pulled into the parking lot of a Quik Trip convenience store in Tulsa, Oklahoma. Ellis was driving, and her husband Harris sat in the front passenger seat. As they entered the lot, Ellis and Harris "noticed a man standing with his leg propped up against the wall to the side of the Quik[ ]Trip." R. vol. 1, 188. Harris testified that Ellis told him the man looked like he was "up to no good." R. vol. 3, 96. Ellis went inside the store, but Harris stayed in the car and kept an eye on the man.

Minutes later, Jose Cruz-Gonzalez pulled his truck into the parking lot and parked immediately to the right of Harris's car. Cruz-Gonzalez went inside the store while his wife, Heidi Argumedo, remained in the truck with their three children. The man who had been leaning against the side of the store then approached the driver's side of Cruz-Gonzalez's truck and stood between Harris's car and the truck. Harris asked the man what he was doing, and he replied, "I'm taking this truck." *Id.* at 98. Harris responded, "No, you're not," and began to open his door. *Id.* But when the man said he had a gun, Harris decided to stay in his car.

The man opened the door of Cruz-Gonzalez's truck, pointed a gun at Argumedo's head, and told her to get out of the truck. She and her children exited the truck, went inside the store, and asked the clerk to call the police. The man then got in the truck and drove away. Video surveillance didn't capture a clear image of the carjacker's face, but it did capture an image of a white male wearing black pants, black shoes, and a white, V-neck T-shirt over a black T-shirt with a red logo or

2

design on it. The top of the black T-shirt and a small portion of the red logo or design were visible above the collar of the V-neck of the white T-shirt.

Soon thereafter, Tulsa Police Officer Garrett Higgins saw a truck matching the description of the stolen vehicle and began pursuing it. During the pursuit, the man driving the truck turned onto a dead-end street, requiring him to turn around. As Higgins navigated past the truck on the dead-end street, he "came door to door" with it. *Id.* at 139. Higgins testified that he was traveling between 15 and 30 miles per hour at the time and that he "got a good look" at the driver. *Id.* at 140. Higgins observed that the driver, a "bald white male wearing a white T-shirt," matched the radio description of the carjacking suspect. *Id.* at 281. Higgins also recognized the driver from a prior arrest, though he didn't recall his name.

Ultimately, the driver abandoned the truck in a ditch. Law enforcement quickly found the truck, set up a perimeter, and began searching the area. Higgins found a white, V-neck T-shirt on the ground about 10 to 20 yards away from the truck. After about two hours, K-9 officers discovered Wofford in a wooded area not far from the abandoned truck. Wofford was wearing a black shirt with a red logo or design on it, black shorts, and no shoes. Higgins identified Wofford as the man he saw driving the truck during the earlier pursuit.

A few hours later, law enforcement interviewed Harris. Harris reported that the man he saw take the truck was a white male with a scar on the right side of his face, wearing a white shirt, black jeans, and black shoes. At that point, law enforcement

informed Harris that they had arrested a suspect. Later, Harris searched the internet to see who had been arrested and saw Wofford's photo on a jail website.

After Wofford's arrest, Tulsa Police Detective Jeffrey Gatwood assembled a photo lineup to show to Harris. Gatwood chose not to use the mugshot taken after Wofford's arrest for carjacking because in that photo, Wofford had blood on his face. Gatwood instead used Wofford's next-most-recent mugshot, which included a visible tattoo underneath Wofford's right eye. Gatwood then used a database system to select five other photos of men who matched Wofford's age, race, height, weight, hair color, and eye color. However, amidst the matching photo options, Gatwood was unable to locate any photos of men with similar facial tattoos. As such, although the six photos depicted men with similar facial characteristics and coloring, only Wofford's photo showed a facial tattoo.

Two days after the carjacking, Gatwood showed Harris the lineup and asked him "to look at each photo carefully, to take his time, and to not feel like he was being pressured." R. vol. 1, 192. Additionally, he instructed Harris to let him know if the carjacker wasn't in the photo lineup. Harris identified the photo of Wofford as the man he saw commit the carjacking.

The government charged Wofford with carjacking and using a firearm during and in relation to a crime of violence. Wofford filed a motion to suppress, seeking to prevent Harris from identifying him at trial. Wofford argued that the photo lineup Gatwood showed to Harris was unduly suggestive and that Harris's identification was unreliable. At the hearing on the motion, Harris, Higgins, and Gatwood testified

4

about the facts described above. Additionally, Wofford presented expert testimony about eyewitnesses from Scott Gronlund, a professor of psychology at the University of Oklahoma. Gronlund opined that because Harris viewed Wofford's photo on the internet before Gatwood showed him the lineup, Harris's lineup identification was unreliable. Specifically, Gronlund said that "it's at least possible that [Harris's] memory [wa]s created or at least updated and modified by seeing [Wofford's] face" on the internet. R. vol. 3, 179. Additionally, Gronlund testified that the composition of the lineup affected the reliability of the identification because the tattoo on Wofford's face makes his photo "stand[] out from the others." *Id.* at 180.

The district court concluded that the lineup wasn't unduly suggestive and accordingly denied Wofford's motion to suppress. Further, it granted the government's motion—made orally during the suppression hearing—to exclude Gronlund's testimony from trial. It concluded that the testimony (1) wouldn't be helpful to the jury, (2) was "devoid of the application of a reliable methodology to the evidence of this case," and (3) would risk "confusing the jury and invading the jurors' province to determine witness credibility." R. vol. 1, 201–02.

After the trial, the jury found Wofford guilty of carjacking.[1] The district court sentenced him to 162 months in prison and three years' supervised release. Wofford appeals.

---

[1] The jury acquitted him of using and carrying a firearm during and in relation to a crime of violence. *See* 18 U.S.C. § 924(c)(1)(A)(iii).

**Analysis**

**I.      The Photo Lineup**

Wofford argues that the district court should have suppressed Harris's in-court identification of him because the photo lineup from which Harris initially identified Wofford was unduly suggestive and the identification overall was unreliable. *See United States v. Kamahele*, 748 F.3d 984, 1019 (10th Cir. 2014) (noting that in challenge to photo lineup, we first ask whether lineup was "unduly suggestive" and then ask "whether the identification[] w[as] still reliable in view of the totality of the circumstances"). The government argues to the contrary, contending that the photo lineup wasn't unduly suggestive and that Harris's identification was reliable.

We need not resolve this dispute. That's because we agree with the government that even assuming the photo lineup was unduly suggestive and Harris's identification was unreliable, any error in admitting Harris's identification evidence was harmless beyond a reasonable doubt.[2] *See Biggers v. Tennessee*, 390 U.S. 404, 408–09 (1968) (noting that admission of unreliable identification evidence based on unduly suggestive lineup violates defendant's due-process rights and thus must

---

[2] Wofford failed to explicitly address harmlessness in his opening brief, and he didn't file a reply brief. Accordingly, we could find that Wofford waived any argument against finding this error harmless. *See United States v. Montgomery*, 550 F.3d 1229, 1231 n.1 (10th Cir. 2008) (noting that failure to make argument on appeal results in waiver). Nevertheless, at oral argument, Wofford's counsel responded to questions from the panel regarding harmlessness. Additionally, we discern in Wofford's opening brief some implicit rebuttals to the government's harmless-error argument. In the interest of a complete harmless-error analysis, we exercise our discretion to overlook Wofford's waiver.

satisfy constitutional harmless-error standard); *Chapman v. California*, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."); *United States v. Ciak*, 102 F.3d 38, 42 (2d Cir. 1996) (assuming error and moving straight to constitutional harmlessness).

The government first asserts that this error was harmless because Harris wasn't the only witness who identified Wofford at trial; Officer Higgins also identified him. Recall that Higgins testified about pursuing the carjacked vehicle and seeing Wofford in the driver's seat—at close range and a relatively slow speed—when Wofford turned around on a dead-end street. After other officers apprehended Wofford, Higgins identified him as the individual he saw driving the carjacked vehicle. He likewise identified Wofford at trial.

On appeal, Wofford attempts to undermine the credibility of Higgins's identification. He points out that Higgins saw the driver of the carjacked vehicle on a rainy night, through a window, while driving between 15 and 30 miles per hour. As such, he contends that Higgins had "only a fleeting opportunity to view the driver" of the carjacked vehicle. Aplt. Br. 29. But Wofford didn't object to Higgins's identification below. And the circumstances of Higgins's identification aren't so unlikely as to be unbelievable. The vehicles slowed down to turn around on the dead-end street, and Higgins said he got "a good look" at the driver while they were "door to door." R. vol. 3, 139–40. As such, the existence of Higgins's identification strongly indicates that any error in allowing Harris to identify Wofford at trial was

7

harmless beyond a reasonable doubt. *See United States v. Hill*, 604 F. App'x 759, 787–88 (10th Cir. 2015) (finding error harmless beyond reasonable doubt because two other eyewitnesses also identified defendant and defendant failed to object to those identifications); *Ciak*, 102 F.3d at 42–43 (finding harmless error in part because another witness identified defendant at trial); *cf. Biggers*, 390 U.S. at 409 (finding error wasn't harmless because it "was the only evidence of identification").

As additional support for its harmless-error argument, the government points to the strong circumstantial evidence that Wofford committed the carjacking. For instance, the officers discovered Wofford in the woods about 150 yards away from the vehicle that had been carjacked. Further, the surveillance video shows that the individual who committed the carjacking wore a white, V-neck T-shirt over a black shirt with a red logo or design on it. That outfit aligns with the clothing either worn by Wofford at the time of his arrest or found nearby. Specifically, when the officers found Wofford, he was wearing a black T-shirt with a red logo, and officers found a discarded white, V-neck T-shirt about 10 to 20 yards from the carjacked vehicle.

Wofford, for his part, insists that the evidence against him was weak. In support, he points out that law enforcement (1) never located the gun allegedly used during the carjacking and (2) didn't identify Wofford's DNA on the white T-shirt discovered outside the truck. He also points to his acquittal on the firearm charge, stating that it "dispels any conclusion that the government's evidence was overwhelming, or even strong." Aplt. Br. 29.

8

We disagree that these evidentiary absences undermine the strong circumstantial evidence that Wofford committed the carjacking. Indeed, the absence of proof of a firearm likely explains why the jury acquitted Wofford of the firearm charge, but it doesn't have much to do with whether Wofford in fact committed the carjacking. As for the white T-shirt, the testimony at trial was that "there were *no* DNA samples that could be retrieved from the white T-shirt," not that Wofford's DNA wasn't found on the shirt. R. vol. 3, 330 (emphasis added). Moreover, the lack of Wofford's DNA on the white T-shirt doesn't undo the strong inference that Wofford—wearing a white V-neck, T-shirt over a black T-shirt with a red logo or design on it—committed the carjacking and then shed the white T-shirt after abandoning the carjacked vehicle. This strong circumstantial evidence is further reason to find any error in admitting Harris's identification harmless beyond a reasonable doubt. *See United States v. Rogers*, 126 F.3d 655, 660 (5th Cir. 1997) (finding harmlessness in part because other evidence of guilt was overwhelming, including clothing from surveillance video found in defendant's home and car); *Ciak*, 102 F.3d at 42–43 (finding harmlessness because of strong circumstantial evidence of guilt, including that defendant matched detailed suspect description).

In sum, because of the other witness identification and the strong circumstantial evidence against Wofford, we are convinced that the jury would have rendered a guilty verdict in the absence of Harris's identification. Thus, any error in admitting Harris's identification was harmless beyond a reasonable doubt.

## II.     The Expert Testimony

Wofford next challenges the district court's decision to exclude Gronlund's testimony from trial. We review that decision for an abuse of discretion. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006). Federal Rule of Evidence 702 requires a district court to "satisfy itself that the proposed expert testimony is both reliable and relevant . . . before permitting a jury to assess such testimony." *Id.* Reliability is about "the reasoning and methodology underlying the expert's opinion." *Id.* at 1123 (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003)); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993) (setting out nonexclusive factors for district court's "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"). Relevance is about whether the expert testimony "will assist the trier of fact" or whether it instead falls "within the juror's common knowledge and experience" and "will usurp the juror's role of evaluating a witness's credibility." *Rodriguez-Felix*, 450 F.3d at 1123.

Here, the district court concluded that Gronlund's testimony was neither reliable nor relevant. First, it found that Gronlund's "very generalized descriptions of studies and his overall experience" didn't "present a reliable methodology or explain how any such methodology can be reliably applied to the evidence." R. vol. 1, 201. As such, the district court reasoned, Gronlund's testimony was "devoid of the application of a reliable methodology to the evidence of this case." *Id.* Second, the

10

district court determined that the evidence would "not help the jury to understand the evidence or to determine a fact in issue in this case." *Id.* On the contrary, the district court concluded that Gronlund's ultimate conclusion—that "[t]he eyewitness evidence in this case is weak and problematic," Supp. R. vol. 1, 8—would "present a serious risk of confusing the jury and invading the jurors' province to determine witness credibility," R. vol. 1, 202.

On appeal, Wofford first argues that Gronlund's testimony was reliable because "he relied on his findings and the findings of other experts in his field." Aplt. Br. 31. Specifically, Wofford points out that Gronlund "reviewed numerous field studies on identification issues and had published numerous reports on his own studies." *Id.* But beyond these conclusory statements, Wofford doesn't challenge the district court's conclusion that Gronlund's "experiments with students outside of real-world circumstances and his review of research into other potential problems with eyewitness identification issues is unhelpful to the specific evidence in this case." R. vol. 1, 201. Indeed, Wofford fails to explain how Gronlund's general expertise in this area relates to the specific evidence in this case. As such, we discern no abuse of discretion in the district court's reliability finding. *See Rodriguez-Felix*, 450 F.3d at 1126 (finding no abuse of discretion in exclusion of expert testimony where expert relied primarily on "generalized assertions regarding the factors which can affect an eyewitness's identification").

Wofford next attacks the district court's relevance finding. He asserts that Gronlund's testimony would not have addressed "whether a particular witness [wa]s

11

lying," but rather "would have educated the jurors to provide them tools by which they could assess the witness'[s] credibility or reliability." Aplt. Br. 33. But this argument merely suggests that Gronlund's expert testimony would provide the jury with the same information as "skillful cross-examination." *Rodriguez-Felix*, 450 F.3d at 1125. Indeed, when cross-examining Harris, defense counsel highlighted various issues with the reliability of Harris's identification of Wofford, including (1) inconsistencies between what Harris testified to at trial and the description he gave on the night of the event and (2) Harris's inability to recall what the carjacker was wearing. Defense counsel also elicited the fact that Harris looked up Wofford's photo on the internet before selecting Wofford's photo from the lineup. Further, defense counsel inquired whether the stress of having a gun pointed at him affected Harris's memory of the carjacking. He also asked whether Harris's brain injury impacted Harris's ability to recall events. Wofford points to nothing in Gronlund's testimony that would have helped the jury assess the reliability of Harris's identification more than or differently than this cross-examination. *See id.* at 1126 (finding no abuse of discretion in district court's lack-of-relevance finding because "cross-examination amply exposed the common-sense deficiencies in the prosecution's identification case"). Thus, the district court didn't abuse its discretion in concluding Gronlund's opinion wasn't relevant.

Finding no abuse of discretion in any of the district court's reasoning, we affirm its order excluding Gronlund's testimony from trial.

## Conclusion

We assume that the photo lineup was unduly suggestive and that Harris's identification was unreliable. But we conclude that any error in admitting Harris's identification at trial was harmless beyond a reasonable doubt because another witness also identified Wofford at trial and strong circumstantial evidence tied Wofford to the carjacking. Additionally, we hold that the district court's decision to exclude Gronlund's expert testimony wasn't an abuse of discretion. Accordingly, we affirm Wofford's conviction.

Entered for the Court


Nancy L. Moritz
Circuit Judge

13