**F I L E D**

**UNITED STATES COURT OF APPEALS**

**June 30, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

    v.

ROMONIA JEAN BLUNT,

      Defendant - Appellant,

-----------------------------------------

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

    v.

EDDIE KAY COPEMAN,

      Defendant - Appellant.

No. 04-7003

E. D. Oklahoma

(D.C. No. CR-03-09-02-P)

No. 04-7004

E. D. Oklahoma

(D.C. No. 03-CR-9-P)

**ORDER AND JUDGMENT***

Before **TACHA**, **HARTZ**, and **TYMKOVICH**, Circuit Judges.

---

*After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Romonia Blunt was charged in Count One of a nine-count indictment with conspiracy to possess with intent to distribute more than 500 grams of methamphetamine. Eddie Kay Copeman, her common-law husband, was charged in the same count, and also in eight additional counts. At trial the district court granted a motion for judgment of acquittal on two counts. Both were convicted by a jury on Count One. Mr. Copeman was also convicted on the other remaining six counts, all involving drug and firearms offenses. Both Mr. Copeman and Ms. Blunt contend on appeal that their Fourth Amendment rights were violated by police entry into their home following their arrest, and that they were sentenced in violation of *United States v. Booker*, 543 U.S. 220 (2005). Each also raises issues individually. Ms. Blunt contends that two search warrants were exercised with such flagrant disregard for their terms that all the seized evidence should be suppressed. And Mr. Copeman contends that prosecutorial misconduct denied him a fair trial and that a mistrial should have been granted when a government agent testified that it was difficult to get people to cooperate in the investigation because they were afraid Mr. Copeman would kill them. We will summarize the relevant facts as we address each issue.

# I. FOURTH AMENDMENT CLAIMS

## A. Background

In October 2002 law enforcement officers went to the home of Mr. Copeman and Ms. Blunt in Keota, Oklahoma, to execute arrest warrants for them both. They came out of their home and were arrested without incident. After they had been secured, two other individuals approached from behind the residence. Agent Steve Fioretti of the Haskell County Sheriff's Department asked them if they had any weapons. One of them, Ms. Rhonda Allen, said that she had a knife. As she pulled it from her pocket, Agent Fioretti saw a bag of white powder in her possession, which was seized. It field-tested positive for methamphetamine.

A third person, Ms. Judy Harp, who was barefoot, then exited the residence. After she was frisked she asked the officers if she could go back into the home to get her shoes. According to Agent Fioretti, he "asked if she lived there, and she stated 'Well, yeah, I'm kind of like the kids nanny and I do the cleaning and I do the shopping.'" R. Vol. XVIII at 15. She offered to "take somebody in with her to get her shoes." *Id*. Agent Fioretti instructed Oklahoma Highway Patrol Trooper Clint Craft to accompany her. Agent Fioretti testified that he "had never had any dealings with" Ms. Harp and was concerned about weapons in the residence: "I didn't know if she would go in and try to get a weapon and come back outside or try to get a weapon and flee or what she was

going to do." *Id*. at 16. Trooper Craft testified that he was in the home for only 30 seconds, and simply followed Ms. Harp to the bathroom where she put her shoes on. When he first entered the home, he saw a jar on a dresser by the front door with different types of syringes in and around it. Some of the syringes were of a type he knew to be used to inject methamphetamine.

Agent Fioretti obtained a search warrant for the home, relying in part on the methamphetamine found on Ms. Allen, the five additional small bags (one that tested positive for methamphetamine) found on Ms. Allen when she was booked into jail, and Trooper Craft's observation of the syringes. The warrant authorized a search for evidence of drug distribution, particularly methamphetamine, and weapons. According to the return on the warrant, officers seized several items from the home, including "several bags with a white chunky substance," a "9 MM semi auto handgun," a bag containing $64,5000, and "[s]everal plastic bottles wrapped in black tape containing a total of $90,000.00." R. Vol. I Doc. 18, Gov't Ex. One at 7. During execution of the warrant, Agent Fioretti saw a door that had been taken off a black truck; its Vehicle Identification Number was in plain view. A check revealed that the vehicle had been reported stolen. He informed the other officers on the scene to stop searching. They obtained a second warrant, which authorized a search for evidence of drug-related activity, firearms, and "stolen merchandise," including, among other things, "electronics equipment, hand tools, power tools, firearms and ammunition," any evidence of stolen

vehicles, and "[t]ools utilized in the renumbering of vehicles." *Id.*, Gov't Ex. Two at 10. The search yielded 85 seized items. Some of the items were seized because police were able to verify on the scene that they were stolen. Other seized items fit general descriptions of items that had been reported stolen. Agent Fioretti testified that they seized many items that they "thought" were stolen with the intention to "verify . . . at a later date." R. Vol. XVIII at 72.

A third warrant was obtained to search another residence for evidence of drug-related activity and weapons. The return lists 35 items or, rather, categories of items, that were seized; most were drug-related but officers also seized 110 cows, 2 pigs, 15 horses, a mule, 2 hay buggies, 5 trailers, a hay rake, and a Ford semi truck and trailer. Agent Fioretti testified that these items were seized for caretaking purposes, and to prevent theft.

Mr. Copeman and Ms. Blunt both contend that the police entry into their home with Ms. Harp to obtain her shoes violated the Fourth Amendment, and that without the illegal entry there was not sufficient probable cause to issue the first search warrant. Ms. Blunt also challenges the searches under the second and third warrants, contending that the officers conducting the searches flagrantly violated the terms of the warrants and conducted general searches.

**B.    Discussion**

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings

of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." *United States v. Apperson*, 441 F.3d 1162, 1184 (10th Cir. 2006) (internal quotation marks omitted).

### 1. Initial Entry

The district court denied the motion to suppress the items seized under the first warrant, relying on *United States v. Butler*, 980 F.2d 619 (10th Cir. 1992), to conclude that the police did not violate the Fourth Amendment by entering the home with Ms. Harp to retrieve her shoes. In *Butler* a shoeless man was arrested outside his home when the arresting officer noticed broken glass on the ground. To obtain shoes for the arrestee, the officer took him back into his home, where the officer saw a gun next to the bed. We held that when there is "a legitimate and significant threat to the health and safety of the arrestee," police may accompany him back into the home to obtain clothes. *Id*. at 622.

Although recognizing that there was no health or safety issue in this case with respect to the arrestees (Mr. Copeman and Ms. Blunt), the district court based its finding on the safety of the officers, stating that "there is no evidence suggesting that Craft escorted Harp for any reason other than to ensure officer safety while she retrieved her shoes." R. Vol. I Doc. 29 at 6.

In the alternative, the district court also found that "it was entirely reasonable for Fioretti to believe Harp had authority to consent to the entry." *Id*. Ms. Harp said she lived there and was like a nanny. *See Illinois v. Rodriguez*, 497

U.S. 177, 179 (1990) ("[A] warrantless entry . . . does not violate the Fourth Amendment[ ] . . . if the officers have obtained the consent of a third party who possesses common authority over the premises."). She offered to take an officer into the home with her. According to the court, her statement that she lived there and her offer to take an officer in with her "made it reasonable for Fioretti to conclude that she had the authority to enter the house herself and, moreover, to consent to the entry into the house by law enforcement officials." R. Vol. I Doc. 29 at 7. *See Rodriguez*, 497 U.S. at 186 ("The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.").

On appeal Mr. Copeman and Ms. Blunt have challenged only the first basis for the district court's ruling. Ms. Blunt raises the apparent-authority issue in her reply brief, but we generally do not address issues raised for the first time in a reply brief. *United States v. Holbert*, 285 F.3d 1257, 1263 (10th Cir. 2002) ("The general rule is that appellate courts will not entertain issues raised for the first time on appeal in an Appellant's reply."). We therefore affirm the district court's ruling on Trooper Craft's entry.

Ms. Blunt also contends that during the execution of the second and third search warrants "officers seized numerous items . . . for which there was no probable cause or source in the warrants for seizure. This converted the searches into general searches and requires blanket suppression." Blunt Aplt. Br. at 11. The district court rejected the argument, stating that other than the animals and some stolen property "the items listed on the return were property falling under one of the listed categories of the search warrant." R. Vol. I Doc. 29 at 11. It did state, however, that items that "were seized during the execution of these warrants based on non-specific information from the Haskell County Sheriff and his deputies that they had 'heard or remembered' general reports of stolen property" should be suppressed *Id*.

"If evidence is illegally seized, the general rule is that only the improperly seized evidence, not all of the evidence, must be suppressed . . . ." *United States v. Hargus*, 128 F.3d 1358, 1363 (10th Cir. 1997) (internal quotation marks omitted). But "even evidence which is properly seized pursuant to a warrant *must* be suppressed if the officers executing the warrant exhibit flagrant disregard for its terms." *United States v. Foster*, 100 F.3d 846, 849 (10th Cir. 1996) (internal quotation marks omitted). "[W]hen law enforcement officers grossly exceed the scope of a search warrant in *seizing* property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby

requiring suppression of *all evidence* seized under that warrant." *Id*. at 849-50 (internal quotation marks and brackets omitted).

Only "[i]n very rare cases" have we "applied the unusual remedy of blanket suppression." *United States v. Le*, 173 F.3d 1258, 1269 (10th Cir. 1999). In *Foster* we held that blanket suppression was appropriate because "there was a wholesale seizure of Foster's property amounting to a fishing expedition." 100 F.3d at 850. One officer testified that they "'*took anything of value*'" and the district court found that "'no attempt was made to substantiate a connection between the seizure of the majority of the seized items and the terms of the warrant.'" *Id*. A similar "fishing expedition" was conducted in *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988). The warrant authorized seizure of only firearms and the records of sales and purchases of firearms, *id*. at 1195, but the officers "seized some 667 items of property none of which were identified in the warrant authorizing the search," *id*. at 1196. In contrast, in *Hargus*, 128 F.3d at 1363, "[a]lthough we [were] given pause by the wholesale seizure of file cabinets and miscellaneous papers and property not specified in the search warrant, the officers' conduct . . . was motivated by the impracticability of on-site sorting and the time constraints of executing a daytime search warrant." Moreover, "[t]he officers were authorized to seize ten broad categories of records, and those records were present in every drawer of both file cabinets." *Id*.

In this case the district found that, with the exception of the seized animals and some stolen goods, all the seized items were within categories described by the warrants. As for the items seized on suspicion that they were stolen, Agent Fioretti testified that they were seized generally because of reports of similar items that were stolen. The officers seized some baseball, football, and basketball cards, for example, because the sheriff assisting the search "had [received] several reports of numerous baseball cards and basketball cards that were stolen in and around Haskell County." R. Vol. XVIII at 30. Several boxes of arrowheads were also seized because "[t]here had been several burglaries where a large amount of arrowhead collections had been stolen in Haskell County and [the sheriff] believed these could be a part of that burglary." *Id*. at 68. A brown leather saddle with "Bar 99" on the back was seized for the same reason. *Id*. at 30. Agent Fioretti testified that on-scene confirmation would have been too time-consuming. But when it could be verified that items were in fact stolen, the officers apparently attempted to do so. Several class rings were seized, for example, which had names on them that were recognized by officers on the scene. Some of those people were called and confirmed that the rings had been stolen. And many items were left behind because they did not appear to be stolen. All the officers on the scene were provided a copy of the warrant, and Agent Fioretti himself made the final decision whether an item should be seized.

The district court specifically suppressed items that were seized under only a general belief that they were stolen. But even if some items were improperly seized, the above account of police procedures shows that the warrants were not executed with "flagrant disregard" for their terms, or that the officers "grossly exceeded" the warrants' authorization. *Foster*, 100 F.3d at 849.

The seized animals are a different story. At the suppression hearing Agent Fioretti explained the decision to seize the animals:

> The sheriff and I talked about it and we called the assistant district attorney and he advised that if we didn't have anybody that could take care of them, that we knew would take care of them, that we needed to take them basically into protective custody. That way we knew they were taken care of.

R. Vol. XVIII at 33. Agent Fioretti testified that he did not know of any other way to care for the animals. He further testified that he had no purpose in seizing the animals other than to care for them. Even if their seizure was improper, the circumstances do not exhibit a flagrant disregard for the warrant. The animals were not seized as evidence and were not admitted into evidence, a factor we found important in *Hargus*, 128 F.3d at 1363 ("[A] search is not invalidated merely because some things are seized that are not stated in the warrant. This is particularly true when the non-specified items are not admitted into evidence against the defendant."). Accordingly, we affirm the district court's denial of the motion to suppress.

## II. PREJUDICIAL TESTIMONY

### A. Background

Mr. Copeman contends that the district court should have granted his motion for a mistrial after FBI Agent Gary Graff testified that Mr. Copeman's associates were afraid that he would kill them if they cooperated with law-enforcement authorities. Some context is helpful to understand why we reject this claim. Part of Mr. Copeman's trial strategy was to impugn the integrity and competence of the officers who conducted the investigation. During his opening statement, for example, counsel for Mr. Copeman told the jury "that by the time you have heard all of this evidence, you will come to the conclusion that [Agent Fioretti] is not an honest police officer, that he will lie and cheat to get somebody convicted." R. Supp. Vol. I (Opening Statements, Aug. 5, 2003) at 28. He accused Agent Fioretti of planting evidence, and suggested that the entire investigation was retaliation because Mr. Copeman had supported the wrong candidate for sheriff. He also questioned why the government did not have certain types of evidence:

> Our government, the FBI, could put a tape, could put a wire, on somebody where you could hear it. And wouldn't that be grand if you had this kind of evidence that you could listen to and say, oh, yeah, I hear that. Oh, he did that. Well, for two or three years they have had this ability. If [Mr. Copeman] is such a big drug dealer, why not hook one of these people up with a wire and send them in so that you wouldn't even have to be asked to guess about whether or not he did or didn't do this.

*Id.* at 35-36.

During cross-examination of Agent Graff, Mr. Copeman's counsel

continued on this theme, questioning Agent Graff about why the investigators

failed to use certain techniques, such as undercover buys, wiretaps, and

informants:

> Q     Okay.  Would it be a fair statement that back in 1999,
> you—the FBI opened an investigation into Eddie Copeman?
>
> A     That is correct.
>
> . . . .
>
> Q     And would it be a fair statement that in '99, 2000, 2001, up
> until October of 2002, he remained a target of the FBI, the DEA, and
> I assume the Haskell County folks?
>
> . . . .
>
> A     At times, he was.  I mean, I worked 15 or 20 other cases.
> There would be times six or nine months would go by and I wouldn't
> even think about Mr. Copeman.
>
> Q     Okay.  Would it be a fair statement that you all attempted
> to—I mean, when they become a target, you like to get evidence, get
> them on video, get them on audio, make a buy, get one of your actual
> FBI agents or an undercover police officer, somebody to go in and
> actually buy from them; correct?
>
> A     If we can do that, that's great, yes, sir.
>
> . . . .
>
> Q     In other cases, do you send actual law enforcement officers
> who have beards and look like druggies, do they go in, and
> sometimes you have actual police officers who make these
> undercover buys?

A        Sometimes.  Rarely, but sometimes.

. . . .

Q        And you didn't do that in this case?

A        The opportunity just did not present itself, no, sir.

R. Vol. X at 319-22.

On redirect, Agent Graff had the following exchange with the prosecutor:

Q        [Defense counsel] asked you about your ability to put wires on people and all of those sorts of things.  Do you remember that kind of inquiry?

A        Yes.  Yes.

Q        Did you attempt—during your investigation of this matter, attempt to introduce a law enforcement officer to Mr. Copeman?

A        Yes.

Q        Were you successful in that attempt?

A        No.

Q        Why not?

A        It was very difficult to get people to cooperate—

[Defense Counsel]:  Object, Your Honor, as—that he attempted to?  I mean, I don't know, are they going to say that, oh, everybody is just so scared?  I mean, it could be very prejudicial, what's fixing to come out, and its—the reason—

The Court:  Okay.  I've heard enough.  The objection's overruled.  You may answer.

By the Witness:

-14-

A    It was very difficult to get anyone to cooperate, because people were terrified of Mr. Copeman, and they were afraid he would kill them if they cooperated.

[Defense Counsel]:  See, Judge.  See what I'm saying?

[Prosecutor]:  He opened the door, Your Honor.

The Court:  I—I sustained the—overruled the objection and let him answer, and you can cross examine him about it, if you choose to.

R. Vol. X at 380-81.

Ultimately, the district court ruled that part of the answer had to be stricken as hearsay:  "Well, I've already made the ruling.  He can answer the question yes, that he made an effort, but the—when the effort gets into hearsay, then it's not admissible."  *Id*. at 383.  The jury was then "instructed to disregard the answer given by this witness, other than the answer that he did make an effort.  The rest of the statement of the witness should be disregarded."  *Id*.

On recross, defense counsel immediately began questioning Agent Graff about the stricken answer:

Q    That part we're disregarding, you didn't put it in any report; did you?

A    I'm not aware of it, sir, no.

Q    Well, wouldn't that be a pretty important part to put in there, that if you tried to wire somebody up, and this is such a bad fellow, wouldn't that go in a report?

[Prosecutor]:  You're Honor, if they're supposed to disregard it, I think further inquiry would—

-15-

[Defense Counsel]: Judge, that's like throwing a skunk up there and telling them not to smell it.

The Court: Do I take it that you've waived—

[Defense Counsel]: No, I'm going to move for a mistrial, because I objected before it ever came in, because I know how they do, I knew what was coming, and that's why I objected.

*Id*. at 383-84. Defense counsel then continued to question Agent Graff about why this information was not included in any report. After the jury was dismissed, defense counsel moved for a mistrial, which the court took under advisement. The next morning the district court denied the motion:

I think under the circumstances I would . . . note on review in my mind that the testimony that preceded that question that, perhaps invited error is too strong a word, but there was as I reviewed the testimony several questions by [defense counsel] to this witness and as I recall even other witnesses as to why there was not a wire. Although I do not condone necessarily the response of the FBI agent on the stand, I think he could have chosen his words much better, I'm not altogether sure that it was not a question that had been overworked by defense counsel.

R. Vol. V at 4-5.

### B.    Discussion

The district court "is in the best position to evaluate the effect of the offending evidence on the jury." *United States v. Behrens*, 689 F.2d 154, 162 (10th Cir. 1982) (internal quotation marks omitted). Therefore

[w]e review a district court's refusal to grant a mistrial for abuse of discretion. In reviewing a court's determination for abuse of discretion, we will not disturb the determination absent a distinct

showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment.

*United States v. Stiger*, 413 F.3d 1185, 1194 (10th Cir. 2005) (internal quotation marks and citation omitted).

The district court did not abuse its discretion in denying the motion for a mistrial. Mr. Copeman contends that the court should have excluded under Fed. R. Evid. 404(b) Agent Graff's statement that officers were unable to find people to cooperate in their investigation of Mr. Copeman because they were afraid he would kill them, and "that because this testimony was erroneously admitted, he is entitled to a new trial." Copeman Aplt. Br. at 14. But the statement was stricken and the jury was instructed to disregard it. The only issue before us is whether, notwithstanding this instruction to the jury, Mr. Copeman was entitled to a mistrial because his "right to a fair and impartial trial ha[d] been impaired." *United States v. Caballero*, 277 F.3d 1235, 1242 (10th Cir. 2002).

We do not believe there was such unfairness. First, the agent's testimony was responsive to defense counsel's specific suggestion that law enforcement officers were inept in not using particular investigative techniques. Second, within minutes of the testimony the court instructed the jury to disregard the portion of Agent Graff's testimony concerning people being afraid of Mr. Copeman. "We presume that jurors will follow clear instructions to disregard evidence unless there is an overwhelming probability that the jury will be unable

-17-

to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Id.* at 1243 (internal quotation marks omitted). Although Mr. Copeman complains that the jury did not receive an additional instruction before it began deliberations, he neither objected to the instructions given by the court, nor proposed another curative instruction. The district court did not abuse its discretion in denying the motion for a mistrial.

## III. PROSECUTORIAL MISCONDUCT

### A. Background

Mr. Copeman points to three statements that he contends represent prosecutorial misconduct. First, during redirect examination of Agent Graff, the prosecutor attempted to ask him about a report by Agent Fioretti. Mr. Copeman's counsel objected that asking Agent Graff about the contents of Agent Fioretti's report called for hearsay. The prosecutor then stated that on cross-examination defense counsel had tried to "mislead the jury as to what Mr. Fioretti's report indicated." R. Vol. X at 375. The second statement came at the beginning of closing argument when the prosecutor stated:

> Also, at the beginning of this case I told you that all of that mattered was whether or not the defendants were guilty of the crimes charged. I submit to you the defendants continually attempt to divert you, confuse you, quite frankly bore you, all on and on and on to avoid that issue.

R. Supp. Vol. I (Closing Arguments, Aug. 18, 2003) at 83-84. Mr. Copeman's counsel objected that "[t]o make these kind of attacks about the defense is

improper." *Id*. at 84. The court sustained the objection and instructed the jury to disregard the comment. Finally, the prosecutor also said during closing argument:

> When my father was younger . . . he used to tell me . . . you could tell what kind of man you are by the enemies you make. It's pretty clear that drug dealers don't like the Steve Fioretti's the Gary Graff's and it's a good thing because they are doing too good of a job. And that business isn't pretty. It destroys people.

*Id*. at 99. Defense counsel objected that the prosecutor was raising a "societal alarm argument" and the court sustained the objection. *Id*.

## B.  Discussion

We apply a two-part test to a claim of prosecutorial misconduct: "First, we decide whether the conduct was improper. Second, we decide whether the conduct, if improper, warrants reversal. The general focus of the second part of the test focuses on whether the prosecutor's conduct affected the fairness of the trial." *Apperson*, 441 F.3d at 1207 (internal quotation marks and citation omitted). "[I]n examining claims of prosecutorial misconduct, we have held that reversal is required only if the improper conduct influenced the verdict." *United States v. Maynard*, 236 F.3d 601, 606 (10th Cir. 2000) (internal quotation marks omitted). Furthermore, "in determining whether the misconduct had such an impact, we consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case." *Id*. (internal quotation marks omitted).

We can quickly dispose of the challenges to the two comments made during closing argument. On each occasion the district court immediately sustained an objection and instructed the jury to disregard the comment. As previously noted, we presume that such curative instructions are obeyed by jurors. *Caballero*, 277 F.3d at 1243. Moreover, with respect to the "societal alarm" argument, the district court observed that "the objection was made quickly enough that if [the prosecutor] was going there, he didn't get there. . . . I don't think we got to that point in front of this jury, that there was any message communicated to the jury about societal concerns. From my view, it was a term introduced and characterized in your objection more than it was the statement actually made by counsel" R. Vol. XVII at 1500.

There remains the statement by the prosecutor that defense counsel was attempting to mislead the jury with respect to the contents of a police report. As with Mr. Copeman's claim of prejudicial testimony, the statement must be viewed in context. During Agent Graff's cross-examination by defense counsel, he was questioned about the search of a 1983 Oldsmobile:

Q      [Y]ou say that you found all of this stuff in the green Oldsmobile on October the 23rd?

A      Yes.

Q      And as far as your concerned, nobody had ever—he said nobody had tampered with it?

A      Not that I'm aware of.

-20-

Q        Were you aware that Agent Fioretti, on October the 22nd, in his search warrant return, listed and swore under oath that, "All the items were, on the 22nd day of October, found—" and one of the items listed, that he says that he found "—one black bag containing several bundles wrapped in black tape containing white chunky substance, five bundles in plastic with white chunky substance, from trunk of car with Arkansas tag 552." Now, that's the same tag that we're talking about, that you say you found with him on the 23rd?

. . . .

A        He has a typo on the date on that report. It should be the 23rd. I've seen the report.

R. Vol. X at 314-15. Defense counsel also questioned Agent Graff about why the typo was not corrected, and why he had not prepared his own report concerning the search. The prosecutor objected that defense counsel was trying to impeach Agent Graff improperly: "He's asking about someone else's report. I believe it's a mischaracterization of the report, in any event." *Id*. at 318.

During redirect examination the prosecutor questioned Agent Graff about the report:

Q        [Defense counsel] asked you a number of questions about Mr. Fioretti's report. Do you recall that?

A        Yes.

Q        I'd like to get that cleared up and actually show you that report.

. . . .

Q        Does this appear to be the report—[defense counsel] never showed it to you, but does this appear to be the report that he was asking you about with Mr. Fioretti.

A       Yes, it is.

. . . .

Q       Does—anywhere in that report, does it indicate that the vehicle was searched on October 22nd, 2002, as you read the report?

. . . .

[Defense Counsel]: Judge, see, that's what he's trying to do, is he's wanting them—I don't want to get in trouble, but he knows this is not admissible, and he's wanting to make them think I'm trying to hide something, that I'm not trying to hide. He can't interpret—he can give the dates. I mean, if he wants to say, yes, he put—the only date was 10/22, there isn't any 10/23 date on there, I don't object to that. But to say I interpret this to mean something else, I object to that.

[Prosecutor]: Your Honor, I believe that [defense counsel]—I wasn't trying to say that he was hiding something, but mislead the jury. He was trying to mislead the jury as to what Mr. Fioretti's report indicated. And I think based on that cross examination, it's perfectly appropriate to introduce [Agent Fioretti's report], so then the jury can determine what significance, if any, to give to the report.

*Id.* at 372-75. The prosecutor argued that because defense counsel had been questioning the witness about the report, "I think, in fairness, to reflect what the exhibit actually says, it's important for the jury to examine it in its totality, and that's why I think it should be admitted." *Id.* at 376. The report was admitted into evidence and the prosecutor asked Agent Graff:

Q       Does it reflect when the vehicle was searched, that you were involved in searching?

A       No, it doesn't give a date.

*Id.* at 378.

-22-

To support his claim that the prosecutor's "trying to mislead" statement constitutes prosecutorial misconduct, Mr. Copeman points us to *United States v. Linn*, 31 F.3d 987, 993 (10th Cir. 1994), where we said "that comments by prosecutors to the effect that a defense attorney's job is to mislead the jury in order to garner an acquittal for his client is not only distasteful but borders on being unethical." We stated that such statements are improper, but that they did not amount to plain error in that case. Here, we are faced with a prosecutor attempting to question a witness about the contents of a police report that he believed had been misrepresented by defense counsel. Rather than stating that it was defense counsel's job to mislead the jury, the statement merely indicated the prosecutor's belief that defense counsel was trying to mislead the jury about a single report. The report was almost immediately thereafter admitted into evidence, and defense counsel was given the opportunity to cross-examine the witness about it. We cannot say that the prosecutor's statement—assuming it was improper—compromised the fairness of the trial.

Finally, Mr. Copeman makes a cumulative-effect argument: "The trial was lengthy, but the prosecutor made several improper statements. The cumulative effect of these multiple incidents of prosecutorial misconduct was such that Mr. Copeman was denied a fair trial." Copeman Aplt. Br. at 19. To the extent that this argument refers to any statements other than the three specifically raised on appeal, Mr. Copeman has not pointed us to any such statements in the record

and it is not our job to search the record for other possible prosecutorial misconduct. *See Apperson*, 441 F.3d at 1204 (refusing to "sift through the case's voluminous record to find support for the defendants' claims" (internal quotation marks and brackets omitted)). If the argument is referring only to the three comments actually raised on appeal, no showing has been made that the comments, individually or cumulatively, prejudiced Mr. Copeman's right to a fair trial.

## IV. SENTENCING CHALLENGES

### A. The Sentences

Applying the United States Sentencing Guidelines (USSG), the presentence report (PSR) for Mr. Copeman calculated a base offense level of 38. This was enhanced by two levels because "a firearm was recovered from the bathroom where, according to witnesses, drug transactions had taken place," R. Vol. II at 7, *see* USSG § 2D1.1(b)(1), plus two additional levels because Mr. Copeman was a leader in the criminal activity, *see* USSG § 3B1.1(c). This created a total offense level of 42, which, combined with Mr. Copeman's criminal-history category I, placed the Guidelines sentencing range at 360 months to life. Mr. Copeman did not object to the PSR. The district court imposed a sentence of 360 months' imprisonment, stating that "[a] sentence at the bottom of the guideline range was imposed to provide just punishment, to promote respect for the law, and to protect the public." R. Supp. Vol. II at 5-6.

The PSR for Ms. Blunt also calculated a base offense level of 38, based in part on a finding concerning drug quantity. A four-level reduction for Ms. Blunt's minor role in the offense, *see* USSG § 3B1.2(a), and a criminal-history category I, created a Guidelines sentencing range of 151-188 months. She also did not object to the PSR and was sentenced to 151 months' imprisonment, the bottom of the Guidelines range, for the same reasons given in Mr. Copeman's case.

Mr. Copeman and Ms. Blunt contend that they were sentenced in violation of *Booker*. They both concede that neither objected below and that our review is only for plain error. "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (en banc) (internal quotation marks omitted). The first two prongs of the plain-error test are satisfied when the sentencing judge applies the Guidelines in a mandatory fashion. *Id.*

**B.    Discussion**

Mr. Copeman contends, and the government concedes, that the sentencing in his case involved both constitutional and nonconstitutional *Booker* error. That is, the sentence was increased based on facts found by the judge, and the Guidelines were applied mandatorily. *See United States v. Gonzalez-Huerta*, 403

F.3d 727, 731-32 (10th Cir. 2005) (en banc) (distinguishing between constitutional and nonconstitutional *Booker* error).

The first enhancement challenged by Mr. Copeman was under USSG § 2D1.1(b)(1), which provides that the offense level should be increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed." The district court granted a judgment of acquittal on Count Four of the indictment, which charged a violation of 18 U.S.C. § 924(c), based on the same firearm. Mr. Copeman contends that the court's judgment of acquittal is inconsistent with the enhancement. We disagree. Section 924(c) requires proof that the defendant "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or . . . , in furtherance of any such crime, possesses a firearm." In contrast, § 2D1.1(b)(1) says, "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." Application Note 3 to § 2D1.1 states: "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." Thus, under § 2D1.1(b)(1), "the government has the burden of proving merely that a weapon was present in some physical proximity to the offense. Once this burden is met, the commentary to the Guidelines allows the defendant to demonstrate that it was 'clearly improbable' that the gun was connected to the offense." *United States v. Gomez-Arrellano*,

5 F.3d 464, 466 (10th Cir. 1993) (internal citation omitted). In considering

Mr. Copeman's motion for judgment of acquittal on the § 924(c) charge, the

primary dispute was not over the presence of the firearm where drug transactions

occurred. Arguing for acquittal on Count Four, Mr. Copeman's counsel said:

"[T]here has been no evidence that [the firearm] was in any way used in

furtherance—or possessed in any furtherance of the drug trafficking crime. What

you have basically is that it was simply possessed." R. Vol. XVI at 1333-34.

Counsel acknowledged that the government "put on [evidence] that at some other

time there had been some sales take place and that the gun was there because they

have brought that out with a witness or two, but . . . there is nothing that would

indicate that we used and carried and possessed in furtherance of." *Id*. at 1334.

The dispute, therefore, regarded whether there was, in the district court's words,

"active employment of the firearm," R. Vol. XVII at 1459 (internal quotation

marks omitted), which is not required for the enhancement. Additionally,

Mr. Copeman's PSR, to which he did not object, states that the "firearm was

recovered from the bathroom where, according to witnesses, drug transactions had

taken place." R. Vol. II at 7.

Mr. Copeman also challenges a two-level increase under § 3B1.1(c), based

on the district court's finding that he "was an organizer, leader, manager, or

supervisor" in the offense. He argues that the jury would not have found the facts

necessary for this enhancement beyond a reasonable doubt. Describing the reasons for this enhancement, the unchallenged PSR states:

> [I]t appears as though Copeman's primary role was that of a distributor of methamphetamine. However, witnesses did describe that Mr. Copeman was the sole decision maker within the conspiracy. He provided Ricky Williams with a location to manufacture the drugs, instructed him when to manufacture the drugs and provided him with the money to purchase the precursors. Further testimony was provided that he would make a list of supplies for co-conspirators to purchase and provide them with the funds necessary to make the purchases.

R. Vol. II at 7. Section § 3B1.1(c) is "satisfied upon a showing that the defendant exercised any degree of direction or control over someone subordinate to him in the distribution scheme." *United States v. Backas*, 901 F.2d 1528, 1530 (10th Cir. 1990). Mr. Copeman argues: "While the judge found this was proven by a preponderance of the evidence, it is not obvious that the jury would have found that it was proven beyond a reasonable doubt. Mr. Copeman was involved with others, but it was not proven beyond a reasonable doubt that he was their leader, organizer, manager or supervisor." Copeman Aplt. Br. at 21-22. Beyond this conclusory statement, however, Mr. Copeman points to no evidence in the record, nor does he attempt to impugn the PSR's sources of information.

We resolve Mr. Copeman's claims on the fourth prong of the plain-error test. "Under the fourth prong of plain-error review, a court may exercise its discretion to notice a forfeited error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Gonzalez-Huerta*, 403

-28-

F.3d at 736. Because the fourth prong imposes such a high burden,

*Booker* challenges are often resolved on the basis of the fourth prong rather than

the third. *Gonzalez-Huerta*, 403 F.3d at 736 ("We need not determine whether

Mr. Gonzalez-Huerta can satisfy this burden because even if he were to meet the

third prong, he must also satisfy the fourth prong to obtain relief.").

Mr. Copeman has not met the "demanding standard" imposed by the fourth prong.

*Id*. at 737.

> We have . . . identified numerous non-exclusive factors that can
> guide our fourth prong analysis. First, we have noted that
> constitutional *Booker* errors will be noticed more freely. Another
> relevant inquiry is the relative strength or weakness of the evidence
> supporting the defendant's sentence under the sentencing guidelines.
> Next, we may consider whether the *Booker* error substantially
> increased the defendant's sentence. [Other relevant factors include] a
> showing that objective consideration of the 18 U.S.C. § 3553(a)
> factors warrants a departure from the sentence suggested by the
> Guidelines, and other evidence peculiar to the defendant that
> demonstrates a complete breakdown in the sentencing process. . . .
> [and] whether the district court would simply reimpose the same
> sentence on remand, or whether instead the sentence would likely
> change to a significant degree if the case were returned to the district
> court for discretionary sentencing.

*United States v. Lauder*, 409 F.3d 1254, 1269-70 (10th Cir. 2005) (internal

quotation marks, citations, and brackets omitted).

Starting with the last factor, although Mr. Copeman was sentenced at the

bottom of the Guidelines range, nothing in the record suggests that were this court

to remand, the district judge would not simply reimpose the same sentence. The

district court expressed no dissatisfaction with the Guidelines-required sentence.

The second factor we have identified—the relative strength of the evidence supporting the sentence—also cuts against a finding of plain error. Mr. Copeman made no objection at sentencing to the presentence report. Also, he has not pointed to anything in the lengthy trial record that would call into question the facts found by the judge for sentencing purposes. He points only to the district court's grant of a judgment of acquittal on the § 924(c) charge. But, as we noted above, the evidence supporting the Guidelines enhancement appears undisputed.

Another factor is whether an objective consideration of the § 3553(a) factors would warrant a departure. Mr. Copeman notes his lack of criminal history, but that history, of course, is considered under the Guidelines. He also points to his age (he was 52 at the time of sentencing), and health (the PSR indicates that in October 2003 Mr. Copeman was hospitalized with congestive heart failure and that he suffers from diabetes). Age and health may play some role in sentencing, but this role should be minor absent extraordinary circumstances. *Cf.* USSG §§ 5H1.1 (age), 5H1.4 (physical condition). Certainly, nothing in the record suggests a "complete breakdown in the sentencing process." *Lauder*, 409 F.3d at 1269 (internal quotation marks omitted).

The final factor is whether the *Booker* error substantially increased Mr. Copeman's sentence. Without the four-level increase that resulted from the two enhancements, Mr. Copeman's sentencing range would have been 235 to 293 months; with the enhancement the range was 360 months to life—an increase of

125 months at the base of the Guidelines ranges. This is a substantial increase. *See id*. at 1270 (increase of 84 months is substantial). But this is the only factor that weighs in his favor.

We conclude that Mr. Copeman has not established that the constitutional *Booker* error in his sentencing "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Gonzalez-Huerta*, 403 F.3d at 736. As we stated in a similar case, "[O]nly one factor weighs in [his] favor, which is that the judge-found facts substantially increased the applicable guideline range. . . . Nonetheless, this one factor—like any of the factors we have identified in our prior cases—is not dispositive, especially given the essentially unrebutted evidence relied on by the district court." *Lauder*, 409 F.3d at 1270-71.

We reach the same result with respect to Mr. Copeman's claim of nonconstitutional *Booker* error, where the plain-error test is applied even more rigorously. To satisfy the fourth prong of plain error on a nonconstitutional *Booker* claim, Mr. Copeman would have to show that allowing the sentence to stand "would be particularly egregious and would constitute a miscarriage of justice." *United States v. Dazey*, 403 F.3d 1147, 1178 (10th Cir. 2005) (internal quotation marks omitted). Mr. Copeman has not made such a showing. *See United States v. Treto-Martinez*, 421 F.3d 1156, 1161 (10th Cir. 2005). There was no plain error in Mr. Copeman's sentencing.

Ms. Blunt also contends that the district court committed constitutional *Booker* error in finding the drug quantity and nonconstitutional *Booker* error in applying the Guidelines mandatorily. We conclude that she also has not satisfied the fourth prong of plain error.

The sole factor that cuts in favor of plain error in Ms. Blunt's case is the substantial increase in the sentencing range that resulted from the district court's finding concerning drug quantity. The jury found that the conspiracy joined by Ms. Blunt involved more than 500 grams of methamphetamine. The corresponding base offense level was 32. The PSR calculated a base offense level of 38, based on a higher drug quantity, but then applied a four-level decrease for Ms. Blunt's minimal role in the offense, leaving her at total offense level 34. Without the court's finding concerning drug quantity, but still considering the four-level minimal-participant reduction, *see United States v. Clark*, 415 F.3d 1234, 1238 (10th Cir. 2005), Ms. Blunt's offense level would have been 28, with a sentencing range from 78 to 97 months. The drug-quantity finding increased the range to 151 to 188 months. This is a substantial increase.

But none of the other factors support a finding of plain error. The evidence supporting the drug quantity is undisputed. The jury did not find that the offense involved *only* 500 grams of methamphetamine, but "in excess of" that amount. R. Vol. I Doc. 119. Additionally, Ms. Copeman raised no objection to the PSR and points to nothing in the record that would indicate that the district court's

-32-

finding was in error. Nor would an objective view of the record show that a departure would be appropriate under the § 3553(a) factors. Speaking on her own behalf at sentencing, Ms. Blunt pointed out that she had a seven-year-old daughter whose mother and father were both going to jail. Her counsel added that she had been convicted of only a single count of conspiracy and asked the court "to recognize the relative difference in the defendants in this case and take into consideration her family responsibilities and grant her whatever leniency the court can see fit in this case." Supp. R. (Blunt Sentencing) at 3. But the difference between the roles of Mr. Copeman and Ms. Blunt was reflected in the four-level decrease Ms. Blunt received for her minor role, and the two-level increase Mr. Copeman received for his role. And, like age and health, family circumstances should be considered only in exceptional circumstances. *Cf.* USSG § 5H1.6. There is nothing in the record indicating that the district court would impose a lesser sentence on remand, and there was no breakdown of the sentencing process. We conclude that Ms. Blunt has not satisfied the fourth prong of plain error with respect to either her constitutional *Booker* claim or her nonconstitutional claim.

## V. CONCLUSION

We AFFIRM the judgment of the district court.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge